**MASONIC BUILDING ASSOCIATION OF HOUSTON, INC., Appellant,**

v.

**Hal D. McWHORTER and Christina McWhorter, Appellees.**

No. 01–03–01060–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 12, 2005.

Richard L. Petronella, Petronella Law Firm, P.C., Houston, TX, for Appellant.

Allan D. Goldstein, Morris, Lendais, Hollrah & Snowden, Houston, TX, for Appellee.

Panel consists of Justices TAFT, JENNINGS, and BLAND.

## OPINION

JANE BLAND, Justice.

The Masonic Building Association of Houston, Inc. (the MBA), appellant, sued Hal D. McWhorter and Christina

McWhorter, appellees, seeking to enjoin the McWhorters from encroaching upon the MBA's property via a wood fence. The McWhorters answered and counterclaimed, seeking to quiet title as to the boundary of the property, and alleging adverse possession for more than ten years. The jury found that the McWhorters, together with their predecessors in interest, had possessed the property adversely along the fence line for more than ten years, and the trial court rendered judgment based on the jury's verdict. We conclude that sufficient evidence supports the jury's adverse possession finding as to the middle section of the existing fence, but that as a matter of law, the McWhorters did not prove adverse possession as to the rear section of the fence and as to a hedge boundary because no hostile, adverse use existed for the requisite ten years. We therefore affirm in part, reverse and render in part, and remand the issue of attorney's fees to the trial court.

### The Facts

The property in dispute, located at 32 Pinedale, Houston, Harris County, Texas, is 116 feet long (north to south) and 4.73 feet wide (east to west), for a total of 576 square feet.[1] The disputed property is comprised of three sections: the front, middle, and rear. In the front section, a planted hedge extends from Pinedale Street to the front of the house ("the hedge section"). In the middle section, an older wooden fence runs along the length of the house, from north to south, extending until a line perpendicular with the front of the garage ("the middle section"). In the rear section, a newer wooden fence runs along the length of a two-story brick

garage to the rear boundary of the property ("the garage section").

One end of a mechanical iron gate separates the hedge and middle sections. The gate runs east to west across the disputed property. This gate weighs about 700 pounds and is covered in wood. The center of the iron gate is attached to an electronic "arm" or "bar" that connects to an electronic box. When activated by an automatic opener, the electronic arm opens and closes the gate. The electronic box and arm, without which the gate could not open, are affixed to the disputed property.

In the late 1970's, David Rubenstein acquired 32 Pinedale from his mother. He testified that a wire or cyclone mesh fence existed between his property and the MBA, which he believed indicated the boundary line. The wire fence had metal posts and "wire that you can see through." Rubenstein could not remember the exact length of the wire fence, but thought it ran "down by the garage," and not the "whole length of the property." In 1985, he removed the wire fence and built a wooden fence along the existing fence line in the middle section. He also built the mechanical iron gate in the driveway, and affixed it to the disputed property. Rubenstein maintained the fence line and the property enclosed within it. Rubenstein testified that he did not intend to take the MBA's land, but he did enclose the land and use it.

In 1989, Andrew and Catherine Echols purchased 32 Pinedale from Rubenstein. Andrew Echols testified that, at the time he purchased the property, the wooden fence ran from the front of the house to

---

1. We attach as Appendix A an excerpt from trial exhibit 3, a copy of the parties' joint survey of the property, for the reader's convenience. The property is also known as Lot 23 of Colby Court. The MBA acquired legal and record title by deed in 1952 to the **west 20** feet of Lot 23 of Colby Court. The McWhorters acquired legal and record title in 1993 to the **east 30** feet of Lot 23 of Colby Court.

the front of the garage—enclosing the middle section. He assumed the fence line was the boundary between his property and the MBA. Echols recalled "some sort of plants" in the front of the property, but he could not remember if the plants were in the same place as the hedges that exist today. Echols testified that the fence ended at the front of the garage, and that no fence or enclosure extended along the fence line from the garage to the rear of the property. Echols maintained the property within the entire boundary line.

In February 1993, the McWhorters purchased 32 Pinedale from the Echols for about $195,000. The McWhorters likewise had no intention to take the MBA's land. At the time of purchase, the older wooden fence, built in 1985, remained, enclosing the middle section. Sometime in 1993, McWhorter extended the fence line by adding 22 feet of a newer wooden fence, enclosing the garage section. He described this fence as having a "lean-to coming out" of it.

In the front section of the disputed property, McWhorter planted a shrubbery hedge that extends from the wooden fence in the middle section toward Pinedale Street. He testified that he planted the hedge along an existing shrub line: "Shortly after we moved in our house in '93, it was clear—you could see an existing shrub line that had been there previous. It was dead." He explained that "you could trail the delineating line from the fence line towards the street." McWhorter asked the MBA president, Phillip Von Stephens, about planting a new shrubbery line "that would be a continuation of the boundary line between our two properties." Von Stephens agreed and shared in the expenses. In 1998, McWhorter planted additional shrubs that extended still further along the front of the property up to Barkdull Street. Von Stephens again agreed that McWhorter could plant the new shrubs. The newer shrubs extend in a curve to incorporate a large tree. The McWhorters do not claim the property along the 1998 shrubs, but do claim the hedge section planted in 1993.

Paul McGaughy, the McWhorters' neighbor, lived behind 32 Pinedale for approximately thirty-three years. McGaughy testified that a wire fence ran along the rear and middle sections, but he could not remember if it ran along the front section. McGaughy testified that Rubenstein removed the wire fence and built a wooden fence where the wire fence had been, but only in the middle section. Rubenstein never erected a wooden fence in the garage section to replace the wire fence. McGaughy further testified that the wire and wooden fences were in plain view, and he believed that the fence was and is the boundary line between the two properties.

The MBA never used nor occupied the land within the wooden fence. In 1997, the MBA negotiated with a nearby church to sell its parking lot property. A survey of the property indicated that the McWhorters' fence encroached onto the MBA property. The MBA demanded that the McWhorters remove the fence, and the McWhorters refused.

### The Procedural History

In September 2001, the MBA sued the McWhorters, seeking a permanent injunction requiring that the McWhorters remove the fence and other encroachments from the property, and seeking rents and attorney's fees. The McWhorters filed an answer and counterclaim, seeking ownership of the property and alleging adverse possession of it for more than ten years. The MBA specially excepted to the McWhorters' counterclaim, asserting that the McWhorters did not properly plead a

trespass to try title claim. On May 1, 2002, the trial court granted the MBA's special exceptions, and ordered that the McWhorters replead. On September 2002, the parties agreed to a continuance, in hope of reaching an out-of-court resolution. The parties did not settle, and the McWhorters filed second and third amended answers, neither containing any legal description of the property.

At trial, the jury found that the McWhorters, and their predecessors in privity of estate, adversely possessed the entire property in dispute, including the hedge, the middle, and the garage sections. The trial court rendered judgment on the jury's verdict.

### Failure to Plead a Description of the Property

At the outset, the MBA contends that the McWhorters failed to plead a legal description of the disputed property by metes and bounds. On June 16, 2003, during a pretrial conference, the McWhorters offered defendants' exhibits 3 and 4, that contained survey drawings and a metes and bounds legal description of the property. The MBA objected on the grounds that, in a trespass to try title suit, a plaintiff must include in the petition a "description of the premises by metes and bounds, or with sufficient certainty to identify the same, so that from such description possession thereof may be delivered." TEX.R. CIV. P. 783(b). The McWhorters' live pleading at that time, their third amended answer, did not include such a description.

The trial court overruled the objection and granted the MBA a running objection.

The McWhorters sought, and the trial court granted, leave to amend their pleadings. The trial court also granted a continuance to the MBA until June 23, 2003, to permit those involved in the trial to attend a funeral. On June 17, 2003, the McWhorters filed a fourth amended answer that included legal descriptions of the property. The court called the case to trial on June 23, 2003.

Under Texas Rule of Civil Procedure 63, parties must amend their pleadings seven days before trial, unless the trial court grants leave to amend. *See* TEX.R. CIV. P. 63. The McWhorters assert that, due to the trial continuance, they timely filed their Fourth Amended Petition seven days before trial, in accordance with Rule 63. The Texas Supreme Court, however, has applied Rule of Civil Procedure 4 to the computation of the time constraints in Rule of Civil Procedure 63. *Sosa v. Cent. Power & Light*, 909 S.W.2d 893, 895 (Tex. 1995). Rule 4 provides that the first day of a time period is not to be counted, but the last day of the period is to be included unless it is a Saturday, Sunday, or legal holiday. TEX.R. CIV. P. 4.[2]

Here, the McWhorters amended their pleading on Tuesday, June 17, 2003, and trial began on Monday, June 23, 2003. Under Rule 4, we do not count the day the McWhorters amended their pleading. *See Id.; see also Sosa*, 909 S.W.2d at 895. The trial began on the sixth day from the date of the filing, one day too soon. *See* TEX.R. CIV. P. 63.

Although the McWhorters did not file their amended pleading within the period prescribed by Rule 63, the

---

2. In *Sosa*, the Sosas filed their second amended original petition exactly one week before a scheduled summary judgment hearing. 909 S.W.2d at 895. In applying Rule 4, the court did not count the day on which the Sosas filed the amended petition. *Id.* The court held that the Sosas timely filed the petition, even though the seventh day was the day of the hearing. *Id.*

McWhorters requested, and the trial court granted, leave to amend the pleadings. *See Id.* Under our rules, a trial court shall grant leave to amend the pleadings, unless the filing operates to surprise the opposing party. *Id.* Construing Rule 63, the Texas Supreme Court has held that "[a] court may not refuse a trial amendment unless (1) the opposing party presents evidence of surprise or prejudice, or (2) the amendment asserts a new cause of action or defense, and thus is prejudicial on its face." *State Bar of Texas v. Kilpatrick,* 874 S.W.2d 656, 658 (Tex.1994) (citing *Greenhalgh v. Serv. Lloyds Ins. Co.,* 787 S.W.2d 938, 939 (Tex.1990)). Moreover, the burden of showing surprise or prejudice rests on the party resisting the amendment. *Id.* (citing *Greenhalgh,* 787 S.W.2d at 939). We review the trial court's ruling under an abuse of discretion standard. *Id.*

The MBA contends that it was surprised by the amended petition because it did not know whether the McWhorters sought the hedge, middle, or rear sections of the property by adverse possession. In its first amended answer, however, filed over sixty days before trial, the MBA asserted a defense that the "rear" and "hedge" portions of the fence had not been in place in excess of ten years. The pleading thus indicates that the MBA knew that the McWhorters claimed a right to title of the entire fence line boundary, including the hedge and rear sections. Moreover, the parties together hired and designated an expert surveyor, Ernest Roth, who prepared a survey and metes and bounds description of the disputed property. Based on this common expert, the pleadings, and the apparent location of the fence, hedge, and garage, the trial court did not err in refusing to heed the MBA's claim of surprise.

In *Vargas v. Vaca,* the San Antonio Court of Appeals held that a trial court did not abuse its discretion in allowing a trial amendment that contained a sufficient description of the disputed land by metes and bounds, because the parties were aware of the disputed strip of land and of its location. 376 S.W.2d 65, 66 (Tex.Civ. App.-San Antonio 1964, no writ); *see also Sterling v. Tarvin,* 456 S.W.2d 529, 536 (Tex.Civ.App.-Fort Worth 1970, writ ref'd n.r.e.) (allowing plaintiffs to amend petition before announcing ready for trial because land description was "obvious" and amendment did not surprise parties). For similar reasons, we hold that the trial court did not abuse its discretion in allowing the trial amendment.

**Sufficiency of the Evidence**

■ The MBA next contends that the evidence of adverse possession is legally and factually insufficient to support the jury's verdict. A party seeking to establish title to land by adverse possession has the burden to prove every fact essential to that claim by a preponderance of the evidence. *Rhodes v. Cahill,* 802 S.W.2d 643, 645 (Tex.1990). In reviewing a legal-sufficiency point, we consider all of the evidence in the light most favorable to the party in whose favor the verdict was rendered, and we indulge every reasonable inference from the evidence in that party's favor. *Formosa Plastics v. Presidio Eng'rs,* 960 S.W.2d 41, 48 (Tex.1998). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Id.* In reviewing a factual-sufficiency point, we consider all the evidence supporting and contradicting the finding. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). We set aside the verdict only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

### Adverse Possession

Adverse possession is "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." TEX. CIV. PRAC. & REM.CODE ANN. § 16.021(1) (Vernon 2002); *Rhodes*, 802 S.W.2d at 645. A person must bring suit no later than ten years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who cultivates, uses, or enjoys the property. TEX. CIV. PRAC. & REM.CODE ANN. § 16.026 (Vernon 2002).

 The test for hostility is whether the acts performed by the claimant on the land and the use made of the land were of such a nature and character as to reasonably notify the true owner of the land that a hostile claim was being asserted to the property. *Winchester v. Porretto*, 432 S.W.2d 170, 174–75 (Tex.Civ.App.-Houston [1st Dist.] 1968, writ ref'd n.r.e.). Adverse possession does not have to continue in the same person if privity of estate exists between each holder and his successor. *Parker v. McGinnes*, 842 S.W.2d 357, 360 (Tex.App.-Houston [1st Dist.] 1992, writ denied). The McWhorters therefore must be in privity of estate with their previous owners in order for the ten-year limitations period to tack from one owner to another. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 16.023 (Vernon 2002).

### *The Intent to Appropriate*

 The MBA contends that the evidence is legally and factually insufficient to support the verdict because the McWhorters and their predecessors in interest testified that they did not "intend to take" the MBA's property. The MBA relies on *Ellis v. Jansing*, in which the Texas Supreme Court held:

> Mere occupancy of land without any intention to appropriate it will not support the statute of limitations. No matter how exclusive and hostile to the true owner the possession may be in appearance, it cannot be adverse unless accompanied by the intent on the part of the occupant to make it so. The naked possession unaccompanied with any claim of right will never constitute a bar.

620 S.W.2d 569, 571–72 (Tex.1981) (citations omitted).[3]

To understand the holding in *Ellis*, one must understand its facts. *Ellis* involved a tract of land divided into lot 3 to the west and lot 4 to the east. *Id.* at 569. A.B. Shoemake was the common source of title to both tracts. *Id.* In 1937, Shoemake dedicated a fifteen-foot easement to the City of Waco for a storm sewer. *Id.* The easement ran along the western boundary of lot 4 and joined the eastern boundary of lot 3. *Id.* After dedicating the easement, Shoemake built a concrete retaining wall on lot 4, located three-and-one-half feet east of the easement's east boundary. *Id.* A four-foot chain link fence topped the retaining wall, which extended two to three feet above the easement. *Id.* at 569–70.

The Jansings, the owners of lot 3, sought adverse possession from Ellis and

3. The trial court's charge to the jury in this case properly tracked the language in *Ellis*, as follows:

> For their possession to be adverse, the claimants need not know that the claimed tract is part of the property to which an adjoining landowner has record title. But the mere occupancy of land without any intention to appropriate it is not adverse possession. No matter what the use and occupancy of the land may be, for possession to be adverse the claimants must intend to appropriate it.

*See Ellis v. Jansing*, 620 S.W.2d 569, 571–72 (Tex.1981).

McDonald, the owners of lot 4, of both the easement and the three-and-one-half foot strip of land that ran between the easement and the concrete wall. *Id.* at 571. The Texas Supreme Court held that the Jansings could not adversely possess the easement because it was dedicated to public use by statute. *Id.* at 570. With respect to the additional strip of land, Copeland, the Jansings' predecessor in title, had removed a flower bed next to the concrete wall, planted grass, and maintained the disputed strip. *Id.* Copeland testified that he took possession of the land assuming that the concrete wall was the boundary line between lots 3 and 4. *Id.* He further testified that, although he had assumed that he owned the disputed strip, he did not intend to claim any property that belonged to the abutting property owners of lot 4. *Id.*

The Texas Supreme Court held that Copeland did not have the intent to appropriate the land from the true owner. *Id.* Even though Copeland had maintained the land and treated it as his own, "the Copeland's yard was never fenced, and entrance onto the easement and adjoining strip between the easement and retaining wall was not obstructed." *Id.* Moreover, Copeland testified that he never claimed or intended to claim any property owned by the abutting property owners. *Id.* The court held that these facts were legally insufficient to sustain a claim of adverse possession. *Id.*

The Jansing's reliance on Shoemake's concrete wall in *Ellis* is distinguishable

from the McWhorter's reliance on the Rubenstein's fence in this case. In *Ellis,* Shoemake, the common source of title to both lots 3 and 4, built the concrete wall, the only barrier or obstruction ever erected on the land. *See id.* A landowner may fence part of his property, but in so doing, he does not disclaim or negate his ownership of his property outside the fenced area. *See Cox v. Olivard,* 482 S.W.2d 682, 685–87 (Tex.Civ.App.-Dallas 1972, writ refused n.r.e.) (holding that landowner, who placed his fence east of true boundary line due to nature of terrain, did not relinquish rights to his land west of fence, when adjoining property owner occasionally grazed cattle in disputed area). Shoemake's concrete wall, which he built on his own property, therefore was not a hostile use. Once Shoemake divided title to the property, no owner of lot 3—including the Jansings—ever obstructed, fenced, or otherwise used the land in a manner inconsistent with or hostile to the owner of lot 4. *See Ellis,* 620 S.W.2d at 571. Thus, the Jansings' reliance on Shoemake's concrete wall, which was not a hostile use of the property at its inception, was legally insufficient to constitute adverse possession. *See id.*[4]

■ Here, Rubenstein was not a common source of title of land on both sides of the fence. Rubenstein did not own the MBA land at the time he erected the fence and enclosed the property to the exclusion of the MBA's use. He built the fence for

---

4. The unique facts in *Ellis*—in which a common owner erected the obstruction upon which a later possessor attempted to rely—accounts for its difference in outcome from that of *Calfee v. Duke,* 544 S.W.2d 640 (Tex. 1976), decided by the court only five years earlier. In *Calfee,* Justice Reavley, writing for a unanimous court, held that actual, visible possession and use, to the exclusion of others, was sufficient to support a jury's finding of adverse possession, despite evidence that the

possessor was mistaken in his belief that he owned the property, and did not intend to "take" it from the record owners. *See id.* at 641–42. *Ellis* did not address the court's decision in *Calfee* in its analysis. To the extent that *Ellis* has been read to require an intent to *steal* the property in dispute, such is not a necessary inference, given its facts. *See* Comment, Judson T. Tucker, *Adverse Possession in Mistaken Boundary Cases,* 43 Baylor L.Rev. 389, 404–05 (1991) (emphasis added).

privacy and to exclude "late night" activity that occurred on the MBA parking lot. He never contacted anyone at the MBA about his replacement of the cyclone fence with the wood fence. His erection of a fence therefore *was* a hostile use of his neighbor's property. *See King v. Inwood N. Assocs.*, 563 S.W.2d 309, 312 (Tex.App.-Houston [1st Dist.] 1978, no writ) (noting fact that adverse possessors' mistaken belief that they owned land in controversy did not defeat claim).

Here, for over ten years, the MBA did not assert its legal right to the disputed property, and evidence exists that the predecessors in title intended to claim the property as their own. All the parties involved—the MBA, the McWhorters, the predecessors in interest, and the neighbor—believed that the fence line was the boundary between the two properties. Although the McWhorters did not "intend to take" the MBA's property because they thought that they rightfully owned the land, the Rubensteins, the Echols, and the McWhorters intended to *use* the property *exclusively as their own*—and did use it to the exclusion of the MBA with respect to the middle section. Moreover, even though they may not have consciously intended to deprive the MBA of its title to the land, both the Echols and the Rubensteins intended to convey the disputed land to their successor in interest. As Mr. Rubenstein testified, "I thought that I was selling them [the Echols] the property, and I assumed that the fence was on the property." Mr. Echols similarly agreed that he and his wife claimed ownership of the disputed property and intended to transfer to the McWhorters "the fence, and all of the land that was within the fence." The jury could have concluded, based on the evidence of the hostile fence that excluded use of the land by the MBA, and the evidence of the predecessors' intent to convey the area within it to a third party, that the predecessors in title did indeed intend to exercise rights to the property that were inconsistent with that of the true owner. We hold that legally and factually sufficient evidence supports the jury's finding of an intent to appropriate. *See Calfee*, 544 S.W.2d at 642.

*The Middle Section*

The wooden fence that Rubenstein built in 1985 existed along the middle section of the boundary, enclosing the disputed land within it for over ten years. It is undisputed that Rubenstein installed the 700–pound, mechanical iron gate in 1985. The electronic box and arm to the mechanical gate, without which the gate could not open, are located in the middle section of the property. The use of the disputed strip within the fence was to the exclusion of the MBA's use of the land for more than ten years. We thus hold that the evidence is legally and factually sufficient to support the jury's verdict of adverse possession with regard to the middle section of the property.

*The Garage Section*

█ The MBA contends that the evidence is legally and factually insufficient to support the jury's verdict with regard to the garage section. We agree. In 1993, McWhorter added 22 feet of wooden fencing in the rear section running along the garage. It was undisputed at trial that the fence along the garage had not existed for the requisite ten years.

The McWhorters contend that a wire fence had existed previously along the location of the disputed boundary line, but could offer no evidence at trial to support this contention. Rubenstein could not remember the length of the wire mesh fence that had existed before 1985. It was undisputed at trial, moreover, that Rubenstein removed this wire fence and replaced it with a wooden fence along the existing

fence line in 1985, but only as to the middle section. McGaughy, the neighbor, concurred that Rubenstein removed the wire fence, built a wooden fence in the middle section only, and did not erect a wooden fence in the garage section:

A. What you see as red brick behind the fence, which is a garage. Left that exposed, and ground-in dirt and grass or weeds up to the building.

Q. So no wooden fence was here, in your observation, when the wire mesh fence went down. The wire mesh fence went down, and no wooden fence was re-erected then; correct?

A. There was no wooden fence erected, that's right.

Echols similarly testified that Rubenstein's 1985 wooden fence ended at the front of the garage, and "there was no fence that extended from the garage" to the rear of the property.

Regardless of whether a wire fence ran along the garage section at some time before 1985, the testimony is consistent that Rubenstein tore it down in 1985 and did not erect a new fence along that section. The garage wooden fence section did not exist until McWhorter built it in 1993, and thus ten years did not elapse before the MBA brought suit in 2001. Although the evidence indicates that all of the predecessors in title cut the grass and maintained the disputed area along the garage section, this evidence is not legally sufficient for adverse possession. *See Bywaters v. Gannon,* 686 S.W.2d 593, 595 (Tex. 1985) (holding that mowing grass, planting flowers, and maintaining hedges are not sufficient hostile acts for adverse possession). Thus, no evidence supports the jury's conclusion that the McWhorters adversely possessed the garage section of the property with any "actual and visible ap-propriation of real property." *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.021(1).

The McWhorters respond that the middle fence "marked the boundary line, and the front and rear portions of the fence were simply continuations of that boundary line." They rely on *Yates v. Hogstrom* for the proposition that "a line may be established as a true boundary line of a tract of land by recognition and acquiescence in the line as the true line by all interested parties for a sufficient length of time." 444 S.W.2d 851, 853 (Tex.Civ.App.-Houston [14th Dist.] 1969, no writ). *Yates* is distinguishable because, in that case, the "boundary line" was an actual fence that had existed for ten years. *Id.* at 852. Here, neither a fence nor any other sort of obstruction separated the garage section from the remainder of the MBA's property for the requisite ten years.

The McWhorters also rely on the ranching case of *Fish v. Bannister,* 759 S.W.2d 714 (Tex.App.-San Antonio 1988, no writ). *Fish* is likewise distinguishable because a fence separated the Fish and Bannister ranches for more than fifty years. *Id.* at 716. The McWhorters cite no other case law to support their contention that a hypothetical continuation of an existing fence line—as opposed to an actual fence—is legally sufficient to establish adverse possession. We hold that legally insufficient evidence supports the McWhorters' claim for adverse possession of the garage section.

*The Hedge Section*

■ The MBA contends that the evidence is also legally and factually insufficient to support the verdict with regard to the hedge section at the front of the property. We agree. The MBA relies on *Bywaters v. Gannon,* in which the Texas Supreme Court held that "[s]ince mowing the grass and planting flowers does not constitute a hostile character of possession

sufficient to give notice of an exclusive adverse possession, it stands to reason that maintaining a hedge does not either." 686 S.W.2d at 595.

The McWhorters respond that, in *Julien v. Baker*, the Fourteenth Court of Appeals held that "planting a hedge" to create a barrier or fence—as opposed to "maintaining a pre-existing hedge"—is a sufficiently permanent, visible and unequivocal act to evidence a hostile character of possession, to give notice to the true owner of the claimant's adverse possession. 758 S.W.2d 873, 876 (Tex.App.-Houston [14th Dist.] 1988, writ denied).

*Julien* is distinguishable because in that case the property owner planted the hedge more than ten years before the suit. *Id.* Here, the McWhorters concede that they did not plant the existing hedge until sometime in 1993—and whatever it replaced was gone or dead. Thus, even if a hedge could constitute evidence of a permanent, hostile use, in circumstances that are distinguishable from *Gannon*, we need not decide that here, because the hedge in this case did not exist for the requisite ten years.[5]

As they do with the garage section, the McWhorters similarly contend that the hedge is a continuation of the middle fence line boundary, which existed for the requisite time frame. The McWhorters cite no case law to support that a continuation of a hypothetical fence line, as opposed to an actual fence or other obstruction, is sufficient to establish adverse possession. We therefore hold that, as a matter of law, the

McWhorters did not establish a claim for adverse possession of the hedge section.

## Jury Charge

The MBA contends that the trial court erred in charging the jury. The MBA objected to jury charge questions 1(a), 1(b), and 1(c) because those questions included property descriptions that the McWhorters did not timely plead. The trial court overruled the MBA's objections. As set forth above, we hold that the trial court did not abuse its discretion in granting the McWhorters leave to amend their pleadings to include legal descriptions of the property. Accordingly, we hold that the trial court did not err · in including those property descriptions in the jury charge.

## Attorney's Fees

The McWhorters and the MBA stipulated that they would submit the issue of attorney's fees to the trial court if the MBA prevailed. "In a suit for the possession of real property between a person claiming under record title to the property and one claiming by adverse possession, if the prevailing party recovers possession of the property from ·a person unlawfully in actual possession, the court may award costs and reasonable attorney's fees to the prevailing party." TEX. CIV. PRAC. & REM. CODE ANN. § 16.034 (Vernon 2002). We hold that the MBA has prevailed with regard to the garage and hedge sections of the property;. therefore, we remand the issue of attorney's fees to the trial court.[6]

---

5. Moreover, the McWhorters' discussion with the MBA president, Von Stephens, evidences that the MBA acquiesced in planting the hedge. The MBA received the benefit of the hedge at the edge of its parking lot and paid for half the expenses. The hedge in this case, therefore, is not a hostile act required for adverse possession—instead, the MBA approved and paid in part for the use of its land.

*See, e.g., Scott v. Cannon*, 959 S.W.2d 712, 722 (Tex.App.-Austin 1998, pet. denied) (granting permission to use land is contrary to hostile occupancy).

6. The MBA also sued the McWhorters for rents; however, it abandons this claim on appeal.

## Conclusion

We hold legally and factually sufficient evidence supports the jury's finding that the McWhorters acquired title by adverse possession to the middle section of the property. We therefore affirm the judgment of the trial court with respect to that boundary. We hold that the evidence is legally insufficient to support a claim of adverse possession as to the hedge and garage sections of the disputed property because no evidence supports the jury's finding that the McWhorters and their predecessors in title appropriated the property in an actual and visible manner, hostile to that of the true owner, for more than ten years. We therefore reverse the judgment of the trial court with regard to the hedge and garage sections of the property and render judgment in favor of the MBA. We remand the cause to the trial court for entry of judgment consistent with our decision, and to determine the issue of attorney's fees.

## APPENDIX A