**Reversed and Rendered and Majority and Dissenting Opinions filed October 7, 2021.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-19-00971-CV

---

## LUIS CASTILLO, Appellant

## V.

## SYLVIA LUNA AND ANNA GARCIA, Appellees

---

**On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 2017-40999**

---

## MAJORITY OPINION

In this adverse-possession suit, the record owner appeals the judgment in favor of the possessors. We agree that the evidence is legally insufficient to support the judgment; thus, we reverse the trial court's judgment and render judgment that possessors take nothing by their claims.

# I. BACKGROUND

Lots 10 and 11 on Gentry Street were previously owned by members of the Sikes family. Manuel and Alice Luna began renting Lot 11 from Samuel Sikes around 1966.[1] At that time, Samuel's sister Alberta lived in the house on Lot 10, which lies immediately south of Lot 11.[2] In 1973, Manuel bought Lot 11 from Samuel in Samuel's capacity both as an individual and as the independent executor of Alberta's estate.

Manuel's wife Alice predeceased Manuel, and when Manuel died in 2012, his five daughters jointly inherited the real property. Three of the children deeded their shares in the property to their sister, Sylvia Luna; Sylvia's sister Anna Garcia retained her 1/5 interest in the home.

There is a garage in the southwest corner of the property, and a chain-link fence runs along the southern side of the property. No one knows who built the garage and the fence or exactly when either were built, but both were in place when the Luna family began renting the property in 1966, and they believed that their property included all of the land within the fence. Manuel Luna used to park his car in the garage, and when the Luna children were growing up and dating, they and their friends and other family members parked their cars in the strip of land between the garage and the street.

In 2015, Luis Castillo bought Lot 10, which is on the other side of the chain-link fence from the Luna home. When buying the property, Castillo had a survey performed and discovered that the fence is located on his property, about three feet

---

[1] When multiple people share the same surname, we use each individual's given name.

[2] We use the directions shown in the earliest survey, which shows the lots facing east and Lot 10 lying directly to the south of Lot 11. Later surveys show the lots facing northeast, so that the boundary between Lots 10 and 11 runs from northeast to southwest.

south of the boundary between Lots 10 and 11. Within the fence line, the southern side of the Luna garage intrudes onto Castillo's property by about eighteen inches. At some point, Sylvia also had a survey performed, and it, too, showed that the entirety of the chain-link fence and part of the garage were located on Castillo's lot.

Castillo informed Sylvia he intended to remove the chain-link fence and replace it with a wooden fence along the property's true boundary. Sylvia then sued Castillo, alleging that the three-foot strip was part of the Luna property by adverse possession. She also sought injunctive relief. As a co-owner of the property, Garcia intervened, similarly seeking declaratory and injunctive relief.

After this suit was filed, Castillo removed the chain-link fence, cut down the trees that had been growing immediately to the north of the chain-link fence, and erected a wooden fence along part of the true border.

After a non-jury trial, the trial court rendered judgment in favor of Sylvia and Garcia. The trial court ordered Castillo to restore the status quo ante, removing his wooden fence, replacing the chain-link fence, and planting trees in the same location as the ones he had removed. The trial court permanently enjoined Castillo from asserting any further claim to the disputed strip of property, and also permanently enjoined Castillo from (a) "obstructing [Sylvia or Garcia], their invitees, successors or assigns, from the disputed portion of the property"; and (b) "harassing [Sylvia or Garcia], their invitees, successors and assigns, or taking any action that would inhibit or impair [Sylvia or Garcia] from the quiet use and enjoyment of their property."

In five issues, Castillo appeals the judgment on the grounds that (a) there is legally and factually insufficient evidence that the Luna family actually used the disputed strip of property; (b) the fence cannot support an adverse-possession claim because it was a "casual fence" and Sylvia and Garcia presented no evidence of the fence's origin and purpose; (c) the presence of the garage does not support the

3

adverse-possession claim; (d) because the Luna family did not adversely possess the disputed strip of property, the trial court erred in rendering injunctive relief; and (e) some of the injunctive relief is overbroad in that the judgment does not adequately specify the acts to be restrained.

## II. STANDARD OF REVIEW

Where, as here, findings of fact and conclusions of law were neither issued nor properly and timely requested after a nonjury trial, we presume the trial court made all of the factual findings necessary to support the judgment. *See Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). A party may rebut the presumption by demonstrating that the record evidence does not support the presumed finding. *Ad Villarai, LLC v. Chan Il Pak*, 519 S.W.3d 132, 135 (Tex. 2017) (per curiam).

A trial court's presumed findings are challenged for legal and factual sufficiency under the same standards that apply to a jury's verdict. *See Shields Ltd. P'ship*, 526 S.W.3d at 480. When a finding is challenged for legal sufficiency, we review the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id*. at 827. The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the finding under review. *See id*.

When reviewing for factual sufficiency, we consider and weigh all of the pertinent evidence, and we will set the finding aside only if "the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016).

Under any standard of review, the factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *N. E. Indep. Sch. Dist. v. Riou*, 598 S.W.3d 243, 255 n.50 (Tex. 2020). Thus, less evidence is needed to affirm than to reverse a judgment. *Yeng v. Zou*, 407 S.W.3d 485, 489 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

### III. ADVERSE POSSESSION

"'Adverse possession' means an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." TEX. CIV. PRAC. & REM. CODE ANN. § 16.021(1). Here, Sylvia and Garcia asserted their adverse-possession claim under the ten-year limitations statute, which provides that "[a] person must bring suit not later than 10 years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who cultivates, uses, or enjoys the property." *Id.* § 16.026(a). To prevail under this statute, a person must prove by a preponderance of the evidence that the possession of the disputed property by the person, or by the person's predecessors in interest, was (1) actual and visible; (2) adverse and hostile to the claim of the owner of record title; (3) open and notorious; (4) peaceable; (5) exclusive; and (6) involved continuous cultivation, use, or enjoyment for ten years. *See Kazmir v. Benavides*, 288 S.W.3d 557, 561 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

In his first issue, which somewhat overlaps his second and third issues, Castillo argues there is no evidence of the final element, that is, continuous cultivation, use, or enjoyment of the disputed strip for ten years. We agree. To show why this is so, we first identify the time during which the ten-year limitations period must have occurred, and then we examine Sylvia and Garcia's evidence of continuous cultivation, use, or enjoyment during that period.

5

## A.     The Relevant Time Period

"Claim of right" means that the claimant entered into and possessed the property as his own. *See De Arman v. Surls*, 618 S.W.2d 88, 91 (Tex. App.—Tyler 1981, writ ref'd n.r.e.). Although the Luna family entered onto the property in 1966, they did so as tenants. At that time, they did not claim ownership of the disputed strip of land. Sylvia and Garcia claim only that the Luna family initially rented Lot 11, and that they believed the disputed strip to be part of that property. The earliest date that the Luna family would have claimed ownership of the disputed strip was October 10, 1973, when Manuel and Alice Luna bought Lot 11.

But, adverse possession need not continue in the same person; rather, limitations may be proved by "tacking," that is, by cumulating the periods of possession of each holder and successor between whom there is privity of estate. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.023; *Ellis v. Jansing*, 620 S.W.2d 569, 571 (Tex. 1981); *Masonic Bldg. Ass'n of Hous., Inc. v. McWhorter*, 177 S.W.3d 465, 472 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Sylvia and Garcia argue that the period of the Luna family's claim of right to the disputed strip can be tacked onto the prior owner's claim to the same land.

The problem with this argument is that the prior owners of Lot 11 were not shown to have asserted over the disputed strip a similar claim of right hostile to the owners of Lot 10. Garcia testified that her family rented Lot 11 from Samuel Sikes, and both Garcia and Castillo testified that the owner of Lot 10 also had the surname "Sikes." Garcia further testified that Samuel Sikes's sister Alberta Sikes lived next door in Lot 10. Garcia and Sylvia further introduced into evidence the deed evidencing Manuel and Alice Luna's purchase of Lot 11, and the deed shows that the Lunas purchased the property from Samuel T. Sikes.

6

Significantly, however, Samuel Sikes sold the property both in his individual capacity and in his capacity as the independent executor of Alberta Sikes's estate. A reasonable factfinder could not ignore the evidence that the Sikes family owned both lots, and more particularly, that Alberta Sikes both resided at Lot 10 and co-owned Lot 11. Under these circumstances, it would not be reasonable to infer that, regarding the disputed strip, Samuel and Alberta Sikes, as owners of Lot 11, asserted a claim of right hostile to the owners of Lot 10 in a manner that would allow Sylvia and Garcia to "tack" their family's period of alleged adverse possession onto the Sikes family's ownership. *Cf. Gilbert v. Green*, 150 Tex. 521, 525, 242 S.W.2d 879, 880–81 (1951) (noting that the record owner and the possessor's predecessor-in-interest "were brothers-in-law, and there is no direct evidence of any hostility between them while they were in possession" or that the predecessor's "use of this land was made under a hostile claim of ownership"); RESTATEMENT (THIRD) OF PROPERTY (Servitudes) § 2.16 (2000) cmt. g (evidence that will overcome a presumption of prescriptive use "is that the initial users were closely related").

Thus, to prove adverse possession, Sylvia and Garcia needed to show that the resident members of the Luna family cultivated, used, or enjoyed the disputed strip for at least one continuous ten-year period after the Lunas purchased Lot 11 in October 1973.

**B.    The Claimed Use**

In determining whether adverse possession has been proved, we must consider the nature of the land and the use to which it was put. *See Mohnke v. Greenwood*, 915 S.W.2d 585, 593 (Tex. App.—Houston [14th Dist.] 1996, no writ). The claimant need only use the land for a purpose to which is adaptable, and in the same manner an ordinary owner would use the property. *Kazmir*, 288 S.W.3d at 561. Sylvia and Garcia rely on the use of the disputed strip as a garage and driveway.

7

### 1. *Use of the Wooden Structure as a Garage*

The garage is a wooden structure at the back of Lot 11 and intrudes about eighteen inches into Lot 10.[3] Garcia referred to the structure as "my father's garage," and she testified that Manuel Luna used to park his car there, but there is no evidence of the years in which the Luna family used the garage, or the frequency of its use.[4] Thus, there is legally insufficient evidence that, after purchasing Lot 11 in October 1973, the Luna family continuously used the garage for parking or any other purpose for at least ten years.

### 2. *Use of the Disputed Strip as a Driveway*

Although Sylvia and Garcia refer to part of the disputed strip that lies between the garage and the public sidewalk as a driveway, there is not an identifiable improvement in this area. The ground is covered with vegetation, and before Castillo cut them down, trees growing in the southernmost third or so of the disputed strip overtopped the houses on both Lot 10 and Lot 11.

Garcia testified that the part of the disputed strip that lies in front of the garage was used to access the garage and "[f]or parking the cars, especially when me and my sisters were dating." But again, Garcia did not identify a continuous ten-year period when the strip was so used or the frequency of its use. Garcia testified that she moved out of the home on Lot 11 in December 1979, and she last used the area she refers to as a driveway "probably five years ago, maybe, or two years ago." Sylvia does not currently own a vehicle, and no evidence identifies when she last

---

[3] A survey of Lot 11 performed in 1932 for Mrs. S.T. Sikes labels the building, "garage," and a survey performed for Castillo in 2015 and revised in 2017 labels the building, "wood shed on dirt."

[4] We further note that the garage only intrudes onto Lot 10 by eighteen inches. There is no evidence that the area of the disputed strip lying beside or behind the side of the garage was ever used for any purpose.

owned a car, but when asked, she agreed that she rents a car "occasionally." Finally, she testified that after Castillo built a fence on the boundary between the two lots as shown in the property surveys, she "can't bring in a car like [she] always did," but she did not identify when that period began or ended. Like Garcia, Sylvia did not identify the length of time this area of the disputed strip was used as a driveway, or the frequency with which it was so used. Thus, there is legally insufficient evidence that the disputed strip was continuously used as a driveway for at least one ten-year period in the time since the Luna family purchased Lot 11.

## C.    Claimants' Remaining Evidence

As other evidence of their claim to the disputed strip, Sylvia and Garcia rely on the existence of the four-foot-high chain-link fence, and, across the sidewalk from Lot 11, a sloped concrete area that we will refer to as "the driveway approach."

### 1.    *The Chain-Link Fence*

The law of adverse possession has historically recognized two kinds of fences: "casual fences" and fences that "designedly enclose" an area. The distinction arose because unenclosed land is regarded in Texas as commons for grazing livestock. *McDonnold v. Weinacht*, 465 S.W.2d 136, 141 (Tex. 1971). The mere grazing of land casually enclosed by fences built for another purpose will not prove adverse possession, so "[t]he adverse claimant who relies upon grazing only as evidence of his adverse use and enjoyment must show as part of his case that the land in dispute was designedly enclosed." *Id.* at 142. The distinction is significant because the existence of a casual fence is itself insufficient to prove adverse possession. *See W. Prod. Co. v. Kahanek*, 132 Tex. 153, 158, 121 S.W.2d 328, 331 (Tex. [Comm'n Op.] 1938).

Castillo argues that the chain-link fence is a casual fence, while Sylvia and Garcia assert that the fence designedly encloses the disputed area as part of Lot 11, or alternatively, that there is no longer a need to distinguish between the two kinds of fences in the context of residential neighborhoods. *See KB Tex. Invs., LLC v. Spiller*, No. 01-16-00068-CV, 2017 WL 372164, at *10 (Tex. App.—Houston [1st Dist.] Jan. 26, 2017, no pet.) (mem. op.) ("The distinction between casual and enclosed fences is conceptually useful in rural grazing land disputes, but . . . unnecessary in residential neighborhood disputes."). We need not decide whether the distinction between casual fences and designed enclosures applies to residential neighborhoods, because we reach the same result in either case.

### (a)    If the distinction applies, then the fence is a casual fence.

If the historical distinction applies, then the chain-link fence at issue must be considered a casual fence. "If the fence existed before the claimant took possession of the land and the claimant fails to demonstrate the purpose for which it was erected, then the fence is a 'casual fence.'" *Rhodes v. Cahill*, 802 S.W.2d 643, 646 (Tex. 1990) (sub. op. on denial of reh'g) (citing *Orsborn v. Deep Rock Oil Corp.*, 153 Tex. 281, 288–89, 267 S.W.2d 781, 786 (1954)). That is the case here.

A survey of the Luna property conducted in 1932 shows that the southern side of Lot 11 was then only partially fenced, with the fence stopping thirty-nine feet from the front of the lot. The eastern end of the fence encroached on the neighboring lot by 3.5 feet, and the western end of the fence encroached by 4.4 feet. Sometime before the Lunas began renting Lot 11 in 1966, the fence shown on the 1932 survey was replaced with a chain-link fence that extended the full 100-foot length of the lot, but which lay no more than 3.3 feet past the lot's southern border. No evidence identifies the chain-link fence's builder, origin, or purpose, and there is no evidence that the Lunas or their predecessors ever altered, repaired, or maintained the chain-

10

link fence. *Cf. Spiller*, 2017 WL 372164, at *8 ("Repairing and repurposing an existing structure can be evidence of adverse possession if it is an obvious improvement.").

Sylvia and Garcia argue that the chain-link fence is not a casual fence precisely because the partial fence that existed in 1932 was at some point replaced with the chain-link fence, and the chain-link fence connects to the post of a gate that provides the only vehicular access to Lot 11 and to the garage. From these facts, they conclude that the chain-link fence was designedly erected to enclose the disputed area as part of Lot 11. In other words, they argue that because the fence in fact encloses the disputed area with Lot 11, the fence was built for the purpose of enclosing the disputed area with Lot 11. This reasoning, however, is circular. *See also Mohnke*, 915 S.W.2d at 593–94 (testimony about how the claimants used a fence is not evidence of the purpose for which it was constructed).

Moreover, there is no evidence identifying the fence's builder. It may have been built by the record landowner, and a landowner does not abandon part of the land merely by building a fence somewhere other than the property's boundary. *See Masonic Bldg. Ass'n*, 177 S.W.3d at 473 ("A landowner may fence part of his property, but in so doing, he does not disclaim or negate his ownership of his property outside the fenced area." (citing *Cox v. Olivard*, 482 S.W.2d 682, 685–87 (Tex. App.—Dallas 1972, writ ref'd n.r.e.))); *see also Ellis*, 620 S.W.2d at 570–72 (owner of two adjoining lots dedicated an easement fifteen-feet wide on the western border of one lot, and erected an eight-to-ten foot concrete retaining wall topped by a chain-link fence three-and-a-half feet east of the easement; owner of lot to the west did not adversely possess the strip of land between the easement and the retaining wall, despite his belief that his property extended to the retaining wall).

11

We conclude that, to the extent that it is relevant to an adverse-possession claim in a residential neighborhood, the fence must be considered a casual fence.

### (b) If the distinction is unnecessary, then the fence's existence does not affect our analysis.

Relying on *KB Texas Investments, LLC v. Spiller*, Sylvia and Anna argue that the distinction between casual fences and fences that designedly enclose an area is "unnecessary in residential neighborhood disputes." *Spiller*, 2017 WL 372164, at *10. In that case, the First Court of Appeals states that the Supreme Court of Texas has "asked about the origin, substantial modification, or enclosed status of the fence to determine if a fence unmistakably indicates a claim of exclusive ownership." *Id.* (citing *Rhodes*, 802 S.W.2d at 645–46). According to the *Spiller* court, the Supreme Court of Texas now instead "asks about the origin and use of an improvement, not its enclosed status, to answer the same question of notice and intent." *Id.* (citing *Minh Thu Tran v. Macha*, 213 S.W.3d 913, 914–15 (Tex. 2006) (per curiam)).

We need not decide if we agree with *Spiller*. Even assuming, without deciding, that the distinction between casual fences and fences that designedly enclose an area is immaterial when the possessor claims to have adversely possessed land in a residential neighborhood, the chain-link fence's mere existence would not affect our analysis. This is because the claimant bears the burden to prove "every fact essential to that claim by a preponderance of the evidence." *Rhodes*, 802 S.W.2d at 645. The fence may be evidence of notice and intent—that is, it may be evidence that the claimant's possession of the property was actual and visible; that it was open and notorious; and that it was adverse and hostile to the claim of the owner of record title—but it is not evidence of the disputed land's use, which is a separate element. *See Kazmir*, 288 S.W.3d at 561.

12

Sylvia and Garcia argue that they used the chain-link fence to mark the edge of the driveway and as a barrier to prevent other vehicles or objects from accessing the driveway. But, the "use" they were required to prove was not use of the fence; rather, they had to prove ten years' continuous use of the disputed strip of land under a claim of right. And it is evidence of ten years' continuous use that is lacking.

## 2. *The Driveway Approach*

Garcia also testified that, around 1975 or 1980, a concrete "driveway approach" was installed, and its southern edge aligned with the chain-link fence. But the driveway approach is outside the chain-link fence, and it extends no further than the public sidewalk in front of the Luna home. There is no evidence that the structure is on Lot 11. Sylvia and Garcia also failed to offer any evidence that they or their predecessors built this structure, caused it to be built, repaired it, or maintained it. The only evidence of its use is Garcia's testimony that she last used the driveway "[b]etween two and five years ago," that is, after the driveway approach was built in front of Lot 11.

On this record, we agree with Castillo that the evidence is legally insufficient to support the judgment in favor of Sylvia and Garcia on their adverse-possession claim. We sustain Castillo's first three issues.

## IV. INJUNCTIVE RELIEF

In his fourth issue, Castillo argues that because the adverse-possession ruling in Sylvia and Garcia's favor must be reversed, we must also reverse the award of injunctive relief giving effect to the adverse-possession ruling. We agree.

We sustain Castillo's fourth issue. It is therefore unnecessary to address his fifth issue, in which he challenges particular aspects of that injunctive relief.

13

## V. CONCLUSION

Because the record is legally insufficient to support the judgment in Sylvia and Garcia's favor on their adverse-possession claim, we reverse the trial court's judgment and render judgment that they take nothing by their claims.

/s/     Tracy Christopher
          Chief Justice

Panel consists of Chief Justice Christopher and Justices Wise and Hassan (Hassan, J., dissenting).