# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-19-00409-CV

---

### Lisa Ann Hoffman and David Hoffman, Appellants

### v.

### Cecilia Mena, Sheila L. Adams, and JP Morgan Chase Bank, N.A., Appellees

---

### FROM THE 345TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-17-002325, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

This appeal arises from a property boundary dispute between Lisa and David Hoffman and their neighbor Cecilia Mena.[1]  After a bench trial, the trial court signed a final judgment that incorporated an earlier partial summary judgment that the Hoffmans take nothing on their adverse possession claims, rendered declaratory judgment in Mena's favor as to the property boundary line, and awarded Mena $15,415 in attorney's fees.  The Hoffmans appeal, challenging the summary judgment ruling, the legal and factual sufficiency of the evidence supporting the declaratory judgment, and the attorney's fee award.  For the following reasons, we affirm the summary and declaratory judgment, modify the attorney's fee award, and, as modified, affirm the award.

---

[1]  The Hoffmans also sued Sheila Adams and JP Morgan Chase Bank, N.A.  Adams jointly owns the property with Mena but moved out in 2006, and the lienholder bank agreed to be bound by the judgment without appearing at trial.  Because the dispute is primarily between the Hoffmans and Mena, we refer to Mena—and not Adams and the bank—for convenience.

## BACKGROUND

This dispute concerns the boundary line between two residential properties in a subdivision platted in 1917 (the 1917 Plat). The 1917 Plat was divided into blocks of 25- by 125-foot lots. The Hoffmans own lots 3 and 4 in block 49 (the Hoffman Property), and Mena owns the adjacent lots 5 and 6 to the north (the Mena Property). The following background recital is drawn from the undisputed summary judgment and trial evidence.[2]

In 1989, Mena rented a home on the Mena Property. An existing chain link fence enclosed the backyard. Mena had a rabbit, but a neighbor's dog jumped over the fence and attacked the rabbit. To shield her rabbit, Mena built a wood fence on the south side of the Mena Property—ranging from 1 to 12 inches inside the chain link fence. The wood fence was located only on one side of the Mena Property, it blocked the view of the chain link fence from Mena's house, and it stopped before reaching the back end of the property, where there was "an area where you can . . . scooch behind [the wood fence] a little bit" but Mena "had that capped off, so [her] pets wouldn't go behind there." But "[t]here are no improvements whatsoever in the small space between my chain link fence and my wooden fence." In 1993, Mena purchased the Mena Property and obtained a survey by Michael McMinn (the 1993 McMinn Survey), which was based on four iron rods (or pins) that McMinn found at each corner of the Mena Property.

In 2000, the Hoffmans purchased the Hoffman Property and obtained a survey by Steve Bryson (the 2000 Bryson Survey). Within weeks, Lisa informed Mena that she was going to remove the chain link fabric on the chain link fence; Mena requested that Lisa wait a few

---

[2] Some of the background recital is drawn from the Hoffmans' interrogatory responses that Mena submitted with her motion for summary judgment. Mena stated in her motion that she "disagree[s] with the [Hoffmans'] narrative in their discovery responses about the alleged events described." But in response, the Hoffmans neither recanted the narrative they provided in their interrogatory responses nor pointed to or submitted evidence disputing that account.

weeks to give her time to extend the wood fence as she depended on the chain link fence to enclose her dogs; a few weeks later, Lisa observed Mena "hammer the crossbeams and pickets up to the next wooden fence post, for about a 6 foot extension of the existing wooden fence"; and a few days later, the Hoffmans "removed the chain link fabric from the majority of the chain link fence, with the full knowledge and consent of all parties." Lisa also "installed weed prevention cloth covered with bricks on (north) side of the chain link fence"; Mena was "fully aware of this, and agreed that that was a good idea to prevent trees from growing between the two fences"; and "the weed prevention cloth covered with bricks remained there along the chain link fence line until spring of 2016, when [Mena] removed most of it." During this time, Lisa also started to garden between the two fences: she "amended the soil," "pulled the weeds," "put plants in there," removed 39 tree saplings ("junk trees"—"mostly hackberries" but "[t]here might have been a pecan or two"—and some with "big roots" that "had to actually [be] just cut and cut"), and was "in that space several times a week" gardening since August 2000. The Hoffmans and Mena were "neighborly" and "exchanged keys" and "picked up [packages] for each other."

In 2016, the relationship started to deteriorate, and after one incident in which Mena alleged that Lisa "had entered [her] house without [her] knowledge or permission," Mena asked the Hoffmans to return her key. A few months later, Mena was cleaning vines that were coming over the wood fence. She noticed on the other side of the wood fence that metal vertical and horizontal posts remained on the chain link fence but that the chain fabric had been removed. She testified that "when [she] realized that that was gone, that's when it was a problem, because I felt like that was my fence, and that was my property." In October, Mena sent a letter to the Hoffmans stating that she owned the chain link fence and the property between the fences and

requesting that the Hoffmans restore the chain link fence to its original condition and stop trespassing on the property between the two fences. The Hoffmans refused.

In May 2017, the Hoffmans asked Bryson to survey the disputed boundary line again, but Bryson was unable to complete the survey at that time. That same month, the Hoffmans sued Mena for trespass to try title, suit to quiet title, declaratory judgment, and attorney's fees and alleged that "between the two properties is a wooden fence that [the Hoffmans] believe is the boundary between the two properties" and that they alternatively owned the area between the two fences by adverse possession. In July, Bryson returned and completed the survey (the 2017 Bryson Survey). The 1993 McMinn Survey and the 2000 and 2017 Bryson Surveys all showed the boundary line to be roughly along the chain link fence. However, David Hoffman testified that he noticed that some of the dimensions between the 2000 and 2017 Bryson Surveys were no longer the same and that the head of the Bryson crew told him that "in his opinion, the pin at the northwest corner of [the Hoffmans'] lot had been tampered with." Realizing that he needed "to contact a surveyor who would be willing to get involved in something that could involve a lawsuit or litigation," David reached out to "about four or five other surveyors in the Austin area" and eventually made contact with Roger Way at All Points Surveying. In September 2017, a crew from All Points conducted the survey, and Way signed the final survey (the 2017 Way Survey). In Way's expert opinion, the back iron rod on the disputed boundary had been moved, and his crew set a new rod in the location that Way believed the old rod had originally been located. Way marked the location of both rods on the 2017 Way Survey.

In May 2018, Mena counterclaimed for declaratory relief that she owned both the disputed area and the chain link fence and requested attorney's fees. Mena then filed a

4

traditional and no evidence motion for partial summary judgment on the Hoffmans' adverse possession claims, attaching as summary judgment evidence McMinn's deposition transcript, the 1993 McMinn Survey, two letters from McMinn, Mena's declaration, Lisa Hoffman's deposition transcript, the 2000 Bryson Survey, photographs of the disputed property area, and the Hoffmans' responses to interrogatories. In August, the Hoffmans responded, attaching as summary judgment evidence Way's affidavit, David Hoffman's affidavit, the deeds for the Hoffman and Mena Properties, the 2000 Bryson Survey, the 2017 Way Survey, McMinn's deposition transcript, Mena's deposition transcript, a letter from Mena, and the 1917 Plat. Mena objected to portions of David Hoffman's affidavit, which the trial court sustained. In September, the trial court rendered partial summary judgment that the Hoffmans take nothing on their adverse possession claims.

A bench trial on the remaining claims occurred over two days in April 2019. David Hoffman and Way testified as the Hoffmans' witnesses; Mena, Lisa Hoffman (by deposition), and McMinn testified as Mena's witnesses. In May, the trial court signed a final judgment incorporating the partial summary judgment order, rendering declaratory judgment in Mena's favor and declaring that the boundary line is as reflected on the 1993 McMinn Survey, rendering declaratory judgment that Mena and the Hoffmans are joint owners of the chain link fence, and awarding Mena $15,415 in attorney's fees. Upon request, the trial court entered findings of fact and conclusions of law supporting the judgment. After filing a motion for new trial, the Hoffmans now appeal.

5

**DISCUSSION**

In eleven issues, the Hoffmans challenge the trial court's summary judgment, declaratory judgment, and attorney's fee award.

**Summary Judgment**

In their fourth through ninth issues, the Hoffmans challenge the trial court's summary judgment on their adverse possession claim. We review the trial court's summary judgment de novo, taking as true all evidence in the Hoffmans' favor and indulging every reasonable inference and resolving any doubts in the Hoffmans' favor. *See Community Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 680 (Tex. 2017). Here, the trial court granted summary judgment on both traditional and no evidence grounds, and "we must affirm if any of the grounds asserted in the motion are meritorious." *Id.* We review the no evidence ground first, and "[i]f the nonmovant fails to produce more than a scintilla of evidence on the essential elements of a cause of action challenged by a no-evidence motion, there is no need to analyze the movant's traditional grounds for summary judgment." *Id.* at 680–81.

In their fourth issue, the Hoffmans claim that Mena's no evidence motion for summary judgment "was conclusory and failed to adequately specify which elements were being challenged." In her no evidence motion, Mena listed six elements for adverse possession, citing and quoting *Kinder Morgan North Texas Pipeline, L.P. v. Justiss*, 202 S.W.3d 427, 438 (Tex. App.—Texarkana 2006, no pet.) ("1) actual and visible possession of the disputed property; 2) that is adverse and hostile to the claim of the owner of record title; 3) that is open and notorious; 4) that is peaceable; 5) that is exclusive; and 6) the property was consistently and continuously cultivated, used, or enjoyed for ten years."). Mena then stated that the Hoffmans

6

"have no evidence of the following elements . . . 1. Actual and Visible; 2. Open and Notorious; 3. Exclusive; 4. And hostile (adverse) use."  Mena specifically challenged four of the six elements, "clearly identif[ying] which elements, whether some or all, are challenged."  *Hansen*, 525 S.W.3d at 695–96.  That is sufficient to satisfy Rule 166a(i)'s requirement "that a no-evidence motion specifically state the element or elements for which there is no evidence."  *Id.* (citing Tex. R. Civ. P. 166a(i)).  We overrule the Hoffmans' fourth issue.[3]

The Hoffmans allege in their fifth and sixth issues that the evidence identified in and attached to their summary judgment response and supplemental response raised more than a scintilla of evidence to defeat Mena's no evidence motion for summary judgment on their adverse possession claims.  *See* Tex. Civ. Prac. & Rem. Code §§ 16.021–.038 (providing for acquisition of title by adverse possession).  "'Adverse possession' means an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person."  *Id.* § 16.021(1).

---

[3]  The Hoffmans also challenge the specificity of Mena's motion and argue that it "contained no reference to or description of how a fact in the case related to a particular missing element."  It is unclear what specific references or descriptions the Hoffmans are asserting are required to put them on "fair notice" beyond the identification of the challenged elements.  *See Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009) (analogizing purpose of specificity requirement to "that of the 'fair notice' pleading requirements"); *see also B.C. v. Steak N Shake Operations, Inc.*, 598 S.W.3d 256, 259 (Tex. 2020) ("[A] movant seeking a no-evidence summary judgment need only identify 'one or more essential elements of a claim or defense . . . as to which there is no evidence,' and the burden then shifts to the nonmovant to produce 'summary judgment evidence raising a genuine issue of material fact.'" (quoting Tex. R. Civ. P. 166a(i))).  Regardless, the Hoffmans did not preserve error as to any alleged lack of specificity, and our case law requires that "[t]o attack a summary-judgment motion on specificity grounds, the nonmovant must specially except" and "obtain a ruling on the special exception to preserve the issue for appeal."  *See Vodicka v. Lahr*, No. 03-10-00126-CV, 2012 WL 2075713, at *4 (Tex. App.—Austin June 6, 2012, no pet.) (mem. op.) (citing Tex. R. App. P. 33.1(a); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342, 343 n.7 (Tex. 1993)).

7

We conclude that the "hostile" element for adverse possession is dispositive of these issues. "The test for hostility is whether the acts performed by the claimant on the land and the use made of the land were of such a nature and character as to reasonably notify the true owner of the land that a hostile claim was being asserted to the property." *Masonic Bldg. Ass'n of Hous., Inc. v. McWhorter*, 177 S.W.3d 465, 472 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing *Winchester v. Porretto*, 432 S.W.2d 170, 174–75 (Tex. App.—Houston [1st Dist.] 1968, writ ref'd n.r.e.)). In their summary judgment response, the Hoffmans responded to the no evidence challenge as to the "hostile" element with two sentences.

First, the Hoffmans asserted, "Plaintiffs always considered the wooden fence as the boundary between the two properties and they entered the Disputed Area with the understanding that the Disputed Area was part of the Hoffman Property," citing David Hoffman's attached affidavit. But "there must be adverse *possession*, not just adverse *beliefs*," and the possession must be "'hostile to' the claims of all others." *Tran v. Macha*, 213 S.W.3d 913, 914 (Tex. 2006) (per curiam). Merely entering upon land with the belief of ownership, without asserting a claim of right at the outset, does not suffice as evidence of hostile adverse possession. *Bustamante v. Gutierrez Flores*, 770 S.W.2d 934, 937 (Tex. App.—San Antonio 1989, no writ) ("When an adverse claimant enters upon land without asserting a claim at the outset, his possession of the land was not 'commenced under a claim of right inconsistent with and hostile to the claim' of the owner within the meaning of the ten year statute."); *see Tran*, 213 S.W.3d at 915 (noting that "[m]ere occupancy of land without any intention to appropriate it will not support" adverse possession (quoting *Ellis v. Jansing*, 620 S.W.2d 569, 571 (Tex. 1981))). Nor is it "of such a nature and character as to reasonably notify the true owner of the land that a hostile claim was being asserted to the property." *See McWhorter*, 177 S.W.3d at 472.

8

Second, the Hoffmans asserted, "[T]heir claims of adverse possession do not derive merely from gardening but rather from regularly accessing the Disputed Area with the understanding that it was their property, in conjunction with the fact that there was a large wooden fence at the border." As to the Hoffmans' evidence of continued gardening activities, such activities generally do not constitute evidence of hostile possession.[4] *See Bywaters v. Gannon*, 686 S.W.2d 593, 595 (Tex. 1985) (holding that "mowing the grass," "planting flowers," and "maintaining a hedge" "do[] not constitute a hostile character of possession sufficient to give notice of an exclusive adverse possession"); *Blaylock v. Holland*, 396 S.W.3d 720,

---

[4] Moreover, evidence from the Hoffmans' interrogatory answers included in the summary judgment record (and there was no controverting evidence otherwise) shows that Mena consented to the Hoffmans' taking gardening actions to prevent trees from growing between the fences. The Hoffmans stated that Mena was "fully aware" that "Lisa installed weed prevention cloth covered with bricks on [Mena's] (north) side of the chain link fence" and that they "agreed that that was a good idea to prevent trees from growing between the two fences." *See Rubio v. Walsh*, No. 03-13-00698-CV, 2015 WL 4908585, at *2 (Tex. App.—Austin Aug. 13, 2015, no pet.) (mem. op.) ("Permissive occupancy is not adverse. . . . Possession of land by adverse claimants who entered upon the land with permission of the record owner cannot establish adverse possession until they give notice of the hostile nature of their possession."); *Davis v. Johnston*, No. 03-10-00712-CV, 2012 WL 2499472, at *21 (Tex. App.—Austin June 28, 2012, no pet.) (mem. op.) (noting that "adverse" use "requires that the claimant have acted under a 'claim of right'—with intent to use the property in a particular way permanently, as a matter of right, as distinguished from merely trespassing or using the property with or subject to the rightful owner's permission"); *Cambridge Holdings, Ltd. v. Cambridge Condos. Council of Owners*, No. 03-08-00353-CV, 2010 WL 2330356, at *9 (Tex. App.—Austin June 11, 2010, no pet.) (mem. op.) (noting that for adverse claim to be "hostile" it must be "'inconsistent with the idea of a permissive use which may be terminated at the pleasure of the owner'" as "use of property, standing alone, is equally consistent with permissive use as it is with use under a claim of right" (quoting *Hall v. City of Austin*, 48 S.W. 53, 55–56 (Tex. App.—Austin 1898, no writ))); *Masonic Bldg. Ass'n of Hous., Inc. v. McWhorter*, 177 S.W.3d 465, 476 & n.5 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (noting that "even if a hedge could constitute evidence of a permanent, hostile use," it was "not a hostile act required for adverse possession" because evidence existed that owner acquiesced in hedge planting). And "[w]hen the original use of the land in controversy is permissive, it is presumed that the continued use thereof is also permissive in the absence of notice to the true owner of the claimant's repudiation of the permissive use and assertion of an adverse claim." *Werchan v. Lakewood Ests. Ass'n*, No. 03-08-00417-CV, 2009 WL 2567937, at *6 (Tex. App.—Austin Aug. 21, 2009, pet. denied) (mem. op.).

723 (Tex. App.—Dallas 2013, no pet.) ("Mowing the grass, planting flowers, and maintaining a hedge are not sufficient hostile acts to give notice of an exclusive adverse possession."); *Allen & Martha Lewis Revocable Tr. v. Perales*, No. 01-09-00140-CV, 2010 WL 3212125, at *6 (Tex. App.—Houston [1st Dist.] Aug. 12, 2010, no pet.) (mem. op.) (holding that evidence of "planting grass," "flowers," and "a pecan tree" and "mow[ing]," "cultivat[ing]," and "maintaining" them do not constitute summary judgment evidence of hostile possession).[5]

---

[5] To support their position that gardening activities constitute hostile possession, the Hoffmans cite case law from our sister courts and dicta from the Texas Supreme Court. *See Coleman v. Waddell*, 249 S.W.2d 912, 912–13 (Tex. 1952) (noting in dicta that enclosing land and planting garden sufficiently established adverse possession; however, tract not adequately identified for purpose of adverse possession); *KB Tex. Invs., LLC v. Spiller*, No. 01-16-00068-CV, 2017 WL 372164, at *6 (Tex. App.—Houston [1st Dist.] Jan. 26, 2017, no pet.) (mem. op.) ("While pure maintenance, such as cutting weeds, does not suffice, cultivation, such as gardening, may contribute to an adverse possession."); *Kazmir v. Benavides*, 288 S.W.3d 557, 565 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding that testimony that appellees "believed they were purchasing everything within the fences"; "used the entire yard up to the fences, including the sidewalk and patio," "on a regular basis"; "installed a swing set on the patio"; "planted trees and bushes . . . next to the fence"; and "maintained the yard up to the fences" constitutes "legally sufficient evidence of appellees' hostile intent to possess and visible appropriation of the Disputed Area"); *Julien v. Baker*, 758 S.W.2d 873, 876–77 (Tex. App.—Houston [14th Dist.] 1988, writ denied) (holding that planting hedge at border was hostile act).

The Hoffmans' cited case law, however, is distinguishable and unpersuasive given the record here. In *Coleman*, the dicta regarding the sufficiency of the evidence was limited to a garden that the adverse possessors enclosed "by a stock-proof rail fence." 249 S.W.2d at 912. In *Spiller*, the jury found that the predecessors in privity with the adverse possessors "committed a hostile act . . . on August of 1941" when they "upgraded the shed to a garage." 2017 WL 372164, at *1, *3. Although the court noted that "cultivation, such as gardening, *may contribute* to an adverse possession," the gardening alone was not sufficient evidence of adverse possession. *Id.* at *6 (emphasis added). Rather, it was the "repurposing an existing structure . . . when the improvement obviously increases the land's value or productivity"—i.e., "hir[ing] a handyman to repurpose the shed into a car garage"—combined with "the exclusive use of the improvements and gardening" that constituted legally sufficient evidence of the hostile element of adverse possession. *Id.* at *8–9. In *Kazmir*, the gardening activities were combined with building a swing set on the patio, 288 S.W.3d at 565, and the law is clear that "building a structure on property may be sufficient evidence of adverse possession," *see Tran v. Macha*, 213 S.W.3d 913, 915 (Tex. 2006) (per curiam). In *Julian*, the court held that "planting a hedge on the asserted property line of the tract *to create a barrier or 'fence' between the properties* is a

Turning to the Hoffmans' statement regarding the wood fence, it is undisputed that Mena built the fence prior to the Hoffmans' arrival, and the only evidence in the record as to the purpose of the fence was that it was intended to keep neighboring dogs from seeing a pet rabbit. Had the Hoffmans built the wood fence themselves, that may have been sufficient evidence to raise a fact issue regarding adverse possession. *See Tran*, 213 S.W.3d at 915 ("We agree that building a structure on property may be sufficient evidence of adverse possession."). But Mena's building a wood fence prior to the Hoffmans' moving in does not serve as evidence of the Hoffmans' hostile possession. *See McWhorter*, 177 S.W.3d at 473 (noting that "[a] landowner may fence part of his property, but in so doing, he does not disclaim or negate his ownership of his property outside the fenced area"; distinguishing *Ellis* because concrete wall at issue in *Ellis* was "built [by the owner] on his own property, therefore was not a hostile use" by claimant and "was legally insufficient to constitute adverse possession" because it was "not a hostile use of the property at its inception" (citing *Ellis*, 620 S.W.2d at 571; *Cox v. Olivard*, 482 S.W.2d 682, 685–87 (Tex. App.—Dallas 1972, writ ref'd n.r.e.))).

On appeal, the Hoffmans also point to David Hoffman's affidavit, which was attached to their summary judgment response, including to portions that were struck by the trial court, as raising more than a scintilla of evidence of hostile possession. Assuming without deciding that the trial court abused its discretion in striking those portions, the affidavit does not raise any additional facts relevant to the "hostile" element other than those discussed above regarding gardening and the wood fence, and the legal conclusions asserted in the affidavit are insufficient on their own to raise a fact issue precluding summary judgment. *See Mercer*

---

sufficiently permanent visible and unequivocal act to evidence a hostile character of possession." 758 S.W.2d at 877 (emphasis added).

11

*v. Daoran Corp.*, 676 S.W.2d 580, 583 (Tex. 1984) ("A legal conclusion in an affidavit is insufficient to raise an issue of fact in response to a motion for summary judgment[.]"); *Ellis*, 620 S.W.2d at 571 ("This portion of the affidavit in which Mr. Copeland states he held open, notorious, exclusive, continuous and adverse possession to the property in question, represents legal conclusions and is ineffective to raise a fact issue in a summary judgment hearing."); *Lippert v. Eldridge*, No. 03-15-00643-CV, 2016 WL 6068260, at *3 (Tex. App.—Austin Oct. 12, 2016, no pet.) (mem. op.) ("Statements are conclusory when they are not supported by any underlying facts, and statements asserting mere legal conclusions are insufficient to establish the existence of a fact issue."). We overrule the Hoffmans' fifth and sixth issues.

In their seventh and eighth issues, the Hoffmans assert that the Hoffmans' interrogatory responses, which Mena attached as evidence to her hybrid motion for summary judgment, raised a fact issue as to the hostile element and that this Court should consider such evidence even though it was not addressed or raised in the Hoffmans' response. Specifically, the Hoffmans assert that Mena's evidence shows that "in 2000, the Hoffmans tore off most of the chain link from the metal fence with [Mena's] knowledge." But the portion of the Hoffmans' response addressing the no evidence motion "did not address or provide any analysis to direct the trial court to the particular evidence relied on by [the Hoffmans] to create [a] fact issue[]." *See Christensen v. Coursetrends, Inc.*, No. 03-12-00821-CV, 2014 WL 4388622, at *2 (Tex. App.—Austin Sept. 3, 2014, pet. denied) (mem. op.) (collecting cases). Instead, the relevant portion of the Hoffmans' response referenced only David Hoffman's affidavit. *See Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008) ("The respondent is 'not required to marshal its proof; its response need only *point out evidence* that raises a fact issue on the challenged elements.'"

12

(quoting Tex. R. Civ. P. 166a cmt.—1997) (emphasis added))); *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993) ("[I]ssues a non-movant contends avoid the movant's entitlement to summary judgment must be expressly presented by written answer to the motion or by other written response to the motion and are not expressly presented by mere reference to summary judgment evidence."); *Fagerberg v. Steve Madden, Ltd.*, No. 03-13-00286-CV, 2015 WL 4076978, at *5 n.8 (Tex. App.—Austin July 3, 2015, pet. denied) (mem. op.) ("In his responses [to the no evidence motions], not only did [the nonmovant] not specify where the court should look to find the asserted material issues of fact, he did not refer to the evidence, attempt to explain how the evidence raised such questions, or otherwise connect the evidence to the challenged elements."); *Blake v. Intco Invs. of Tex., Inc.*, 123 S.W.3d 521, 525 (Tex. App.—San Antonio 2003, no pet.) (holding that nonmovant who did not "cite, quote, or otherwise point out to the trial court testimony she relied on to create a fact issue" failed to carry her burden to defeat no evidence summary judgment). Additionally, the Hoffmans could not rely on their interrogatory responses to defeat summary judgment because "[a] party may not rely on its own interrogatory responses to raise a fact issue in order to defeat summary judgment, even if the other party puts them into evidence." *Zarzosa v. Flynn*, 266 S.W.3d 614, 619 (Tex. App.—El Paso 2008, no pet.) (collecting cases); *see* Tex. R. Civ. P. 197.3 ("Answers to interrogatories may be used only against the responding party.").[6] We overrule the Hoffmans' seventh and eighth issues.

---

[6] Mena also attached to her motion excerpts from Lisa Hoffman's deposition testimony that briefly mentioned she had maintained the disputed area "[f]rom the time I was able to get that chain-link down" and Mena's affidavit that stated she "was not aware that the mesh had been removed from a portion of the chain link fence until approximately June/July of 2016." But the Hoffmans failed to point out this evidence in their summary judgment response, and their interrogatory response expressly stated that "the Plaintiffs removed the chain link fabric from the

In their ninth issue, the Hoffmans challenge the trial court's traditional summary judgment. Because we have concluded that the no evidence summary judgment can be affirmed, we need not analyze the traditional grounds. *See Hansen*, 525 S.W.3d at 680–81.

**Sufficiency of the Evidence**

In its judgment, the trial court granted Mena declaratory relief on her counterclaim: "[T]he Court finds that the true and correct boundary line . . . is as reflected on the 1993 McMinn [S]urvey." Upon request, the trial court made a finding that the 1993 McMinn Survey, the 2000 Bryson Survey, and the 2017 Bryson Survey all showed "the location of the chain link fence to be roughly on the common property line," although "according to the 1993 McMinn Survey [the chain link fence] encroached on the Hoffman Property by approximately 1 inch at the very front of both properties." The trial court also noted that it "heard contrary expert testimony from the parties' respective surveyor experts regarding the location of the common boundary line . . . and reviewed the 4 surveys which were introduced in evidence" and that it "found the expert testimony of surveyor Mike McMinn credible and persuasive, particularly in light of the location of the common boundary line reflected in the 1993 McMinin [sic] survey and both Bryson surveys." The trial court therefore made conclusions of law that "the true and correct boundary line . . . is as reflected on the 1993 McMinn survey" and that "the Plaintiffs and the Defendants are the joint owners of the chain link fence," "given the evidence presented that the chain link fence was located roughly on the common property line." In their first three appellate issues, the Hoffmans assert that the

majority of the chain link fence, with the full knowledge and consent of all parties." *See, e.g.*, *McWhorter*, 177 S.W.3d at 476 & n.5 (noting that "even if a hedge could constitute evidence of a permanent, hostile use," it was "not a hostile act required for adverse possession" because evidence existed that owner acquiesced in hedge planting).

14

evidence was legally and factually insufficient to support the trial court's declaratory judgment as to the correct boundary line, that the judgment "is uncertain and contradictory on its face and is therefore void and unenforceable," and that the evidence is legally and factually insufficient to support the judgment that the parties are joint owners of the chain link fence.

"A trial court's findings of fact issued after a bench trial have the same weight, and are judged by the same appellate standards, as a jury verdict." *Texas Outfitters Ltd. v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019) (citing *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991)). When, as here, the appellant is attacking the sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, we sustain a legal sufficiency challenge if the appellant shows that no evidence supports the adverse finding, *see Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011), and we sustain a factual sufficiency challenge only if the evidence supporting the finding is so weak as to make the judgment clearly wrong and manifestly unjust, *see Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). In a legal sufficiency review, we generally disregard contrary evidence unless a reasonable factfinder could not have done so; in a factual sufficiency review, we consider and weigh all the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005); *Cain*, 709 S.W.2d at 176. The fact finder is the sole judge of the witnesses' credibility and may choose to believe one witness over another. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (citing *Jones v. Tarrant Util. Co.*, 638 S.W.2d 862, 866 (Tex. 1982)).

In their first issue, the Hoffmans challenge both the legal and factual sufficiency of the evidence supporting the trial court's judgment that the boundary line is as reflected on the 1993 McMinn Survey. In their legal sufficiency challenge, the Hoffmans primarily allege that

McMinn improperly relied on the iron rods as monuments. In their factual sufficiency challenge, the Hoffmans rely on Way's expert testimony to argue that the 2017 Way Survey was properly based on seeking out the intent of the original surveyor, in contrast to the 1993 McMinn Survey.

At trial, McMinn testified as to how he proceeded with determining the 1993 McMinn Survey. He testified that the general process is to do the necessary research to determine the type of property it is (e.g., platted subdivision, metes and bounds) and gather all the various records. Next, the surveyor "arrive[s] on the ground and search[es] for a basis trying to find a couple monuments to get started" and then finds the remainder monuments. Monuments could be either natural or artificial—they could be a rod, iron pipe, spindle, Mag nails, or PK nails, "[i]deally something that will set off a metal detector, although that hasn't always been the case historically." After locating the monument, the surveyor "dig[s] it up and expose[s] it" to identify it as a monument, rather than some other form of metal (e.g., "old Coke cans"). The surveyor then verifies that the dimensions between the monuments are "what we anticipated within a reasonable tolerance," based on the "precision of the work" previous surveyors had done with their own equipment.

In this case, McMinn testified that the subdivision was platted in 1917, and the 1917 Plat was admitted into evidence at trial. The lots were platted as 25 feet wide (the Mena and Hoffman Properties each consisted of two lots), and given the age of the original survey, McMinn estimated a reasonable tolerance of half a foot on either side of the 25-foot lots. McMinn testified that in conducting the 1993 survey, his team was able to find iron rods on all four corners of the Mena Property; that the Mena Property was 49.79 feet wide instead of 50 feet wide per the 1917 Plat; that this did not raise any concern with him because the corners were within the reasonable tolerances he expected; and that it is not unusual to vary within the

16

reasonable tolerance by "2 1/2 inches in 50 foot comparing to something that, at that time, was 100 years old." In the 1993 McMinn Survey, McMinn noted that the chain link fence in the back corner between the Mena and Hoffman Properties was "on line," which he testified "means that a fence at that location is right at the iron rod we found." But in the middle of that property boundary line, he noted ".1 out," which he testified "means that the fence post was a tenth of a foot or just over an inch outside of the property [he was] surveying." He also noted that Mena asked him to return to the property in 2017, and he testified that at that time he confirmed that the back corner monument was in the same place as in 1993 and dug around that monument but did not find another monument in that location.

The Hoffmans argue that McMinn's testimony amounts to no evidence of the boundary line because the iron rod monuments he relied on "were not identified" or "connect[ed]" to "the original survey plat" and therefore amounted to "no probative value." *See King Ranch, Inc. v. Garcia*, No. 04-13-00605-CV, 2014 WL 4627592, at *34 (Tex. App.—San Antonio Sept. 17, 2014, pet. denied) (mem. op.) ("[A] mark or [artificial] object is of no probative value if the field notes or grant contain no description of it or no reference to it and there is no evidence directly connecting it with the work of the original surveyor." (quoting *Gill v. Peterson*, 86 S.W.2d 629, 631 (Tex. [Comm'n Op.] 1935))). But this is merely the "general rule of boundary law." *Id.* (quoting *Gill*, 86 S.W.2d at 631). And "if the location of the actual footsteps cannot be established with reasonable certainty, 'all the surrounding facts and circumstances should be considered in order to arrive at the purpose and intent of the surveyor who made the original survey.'" *TH Invs., Inc. v. Kirby Inland Marine, L.P.*, 218 S.W.3d 173, 204 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (quoting *Hurr v. Hildebrand*, 388 S.W.2d 284, 288 (Tex. App.—Houston 1965, writ ref'd n.r.e.)); *see City of Carrollton*

17

*v. Duncan*, 742 S.W.2d 70, 72 (Tex. App.—Fort Worth 1987, no writ) ("After 90 years have elapsed and time has destroyed in large measure the evidence left by the original locater, it is then permissible, not only permissible, but of necessity is required, that we resort to any evidence tending to establish the place of the original footsteps which meets the requirement that it is the best evidence of which the case is susceptible." (quoting *Taylor v. Higgins Oil & Fuel Co.*, 2 S.W.2d 288, 300 (Tex. App.—Beaumont 1928, writ dism'd w.o.j.))). In such circumstances, "the lines and corners of the survey may be established using any evidence tending to show their location that is 'the best evidence of which the case is susceptible,'" which courts generally consider as "'that evidence which is the more specific and definite as against that which is merely general and indefinite or descriptive.'" *TH Invs.*, 218 S.W.3d at 205 (quoting *Taylor*, 2 S.W.2d at 300).

Here, the 1917 Plat merely stated, "All block corners marked by Iron Pipes," but the lots on which the Hoffman and Mena Properties were located were not on a block corner. In deposition testimony admitted during the summary judgment proceedings, McMinn noted that the 1917 Plat "is not a great plat," that "all that's on the plat is distances," and that "[t]he plat is just a pretty picture saying what they kind of intended to do." McMinn testified at trial that "because the [1917] subdivision plat says they didn't set the actual lot corners; it says they set the block corners," then the iron rods or pipes would have been set "[s]ometime there afterwards." On cross examination, the Hoffmans' expert witness Way agreed, admitting that in 1917 it was "pretty normal practice" to set monuments only on block corners and not "go and set survey monuments for every lot back then"; that "when someone bought one or two or three lots, they would go to that point and survey that particular purchase"; and that the monuments are not "the actual original monuments that would have been set in 1917." Way also agreed with

18

McMinn that at the disputed corner, the "[o]nly thing that was there, the existing monument, was an iron rod." And in his trial testimony, David Hoffman noted that "ideally at each corner of one of these rectangular lots in our neighborhood, ideally there's approximately a two-foot metal rod buried." Finally, McMinn testified that the current location of the iron rod "is the location as being incidence [sic] prior to 1993 when I found it, so it's a long-established monument[]," and that he is "going to have a hard time arguing with a long-established monument." Given this evidence, we cannot conclude that there was legally insufficient evidence to support the trial court's finding that the 1993 McMinn Survey set the boundary line between the Mena and Hoffman Properties. *Cf. Duncan*, 742 S.W.2d at 76–77 ("Whether that axle was the original stake driven by the original surveyor or later placed to mark the known point, it is competent evidence . . . as 'the best evidence of which the case is susceptible.'" (quoting *Taylor*, 2 S.W.2d at 300)).

The Hoffmans also challenge the factual sufficiency of the evidence, arguing that the 2017 Way Survey represented the true boundary line. In that survey, Way drew the boundary line between the wood and chain link fences, basing the line on a new monument he placed in the back corner between the Mena and Hoffman Properties (the Way Iron Rod) after concluding that the iron rod currently in that corner (the Original Iron Rod) was incorrectly placed.[7] Way testified that "[t]he biggest evidence [for adding the Way Iron Rod] is we've got four pins in the back counting the one we set as being one of them; those four pins line up" and that "if you took a straight line from one end to another line to the other, there wouldn't be one of them more than

---

[7] At trial, the Hoffmans' "theory in the lawsuit" was that the Original Iron Rod "was distorted, it was tampered with, it was relocated." On appeal, the Hoffmans no longer rely on this theory, claiming that "their appellate arguments maintain their merit regardless of whether or not the [Original Iron Rod] was moved."

an inch off-line." Way also testified that he set the Way Iron Rod "down a diagonal distance about . . . 9 inches" from the Original Iron Rod, thereby moving the sideline about "[t]hree- to four-tenths of a foot" onto the Mena Property, as shown in the following portion of the 2017 Way Survey:



For the following reasons, however, we conclude that Way did not "clearly" establish that the evidence he relied on to set the new Way Iron Rod was "the best evidence of which the case is susceptible"—i.e., "evidence which is more specific and definite as against that which is merely general and indefinite or descriptive," *see TH Invs.*, 218 S.W.3d at 205 (quoting *Taylor*, 2 S.W.2d at 300)—in contrast to the Original Iron Rod, which McMinn relied on in making the 1993 McMinn Survey.

Assuming without deciding that Way was correct that the Original Iron Rod needed to be moved out of the alley towards the straight line established on the back of the

properties based upon the other monuments found,[8] McMinn provided countering testimony that the iron rod should be moved vertically onto the property line, rather than diagonally. McMinn testified, "[I]f there's a dispute in the line of the alley" and "if somebody told me that the alley line needed to be moved forward 6 inches, 9 inches, whatever the dimension is, I wouldn't do it diagonally; I would do it along the line between the two monuments"—i.e., along the line between the front and back monuments, and both Way and McMinn agreed on the location of the front monument. In other words, McMinn explained that the movement "shouldn't adjust the sideline"; it "could adjust the depth but not the sideline."

Way explained why he set the Way Iron Rod along the straight line established by the other monuments, but his testimony at trial did not explain why he set the Way Iron Rod diagonally from the Original Iron Rod and "[t]hree- to four-tenths of a foot" into the Mena Property. On appeal, the Hoffmans justify this diagonal movement by asserting that "[t]he [Way Iron Rod] is almost exactly 50 feet (49.97 feet) from the iron pipe at the southwest corner of the Hoffman [P]roperty and almost exactly 100 feet (100.01) from the other iron pipe he found north of the Mena [P]roperty" and that "[t]his allowed Hoffman, Mena, and their northerly neighbors each to have two 25-foot wide lots, just as the original surveyor intended." But in the 1993 McMinn Survey, McMinn surveyed the back line of the Mena Property to be 49.79 feet wide between the two iron rod monuments he found along the back corners of the property. Way admitted that if "[t]hree- to four-tenths of a foot" is taken off the Mena Property, the back line would be "down to about 49.3 or 49.4 [feet]"—outside the reasonable tolerances McMinn relied upon—"[i]f we're measuring from the same point." Way and the Hoffmans did not present any

---

[8] The trial court's judgment declared the boundary line between the Hoffman and Mena Properties; it did not establish the boundary line between the alley and the properties. Thus, we need not determine the boundary line between the alley and the properties in this appeal.

evidence disputing the existence or location of the iron rod on the northern back corner of the Mena Property. Although setting the Way Iron Rod to move the Mena Property sideline would make the back property line of the Hoffman Property 49.9 feet, the trial evidence showed that it would also make the back property line of the Mena Property 49.3 or 49.4 feet.

The Hoffmans argue that the diagonal movement is nevertheless justified because the Way Iron Rod is almost exactly 100 feet from an iron pipe Way found at the back corner of the property to the north of the Mena Property. Way testified on redirect at trial that Mena should not "lose any of her dimensions" "because between those pins that are there, there's enough room for four lots." Thus, as the Hoffmans argue in their briefing before this Court, Way "explained that he would give her 50 feet, based on the results of his survey, by dividing in half the land available to her and her northern neighbor." But this ignores the iron rod McMinn found in the northern back corner of the Mena Property located 49.3 or 49.4 feet north of the Way Iron Rod. And Way admitted at trial that "you can't put your theoretical dimensions in; you've got to fit the monumentation that's there." The Hoffmans' argument works only if we give precedence to the iron pipe located 100.01 feet north of the Way Iron Rod over the iron rod McMinn found in the northern back corner of the Mena Property. But given that the iron rod in the northern corner that McMinn relied on is closer to the disputed corner, we cannot conclude that the iron pipe is "more specific and definite" than the closer iron rod such that the iron pipe would be "the best evidence of which the case is susceptible." *See TH Invs.*, 218 S.W.3d at 205 (quoting *Taylor*, 2 S.W.2d at 300).[9]

---

[9] Way testified at trial that "pipes were used a whole lot by surveyors until about 1950," that "those would be one of the oldest man-made monuments" used in industry practice, and that therefore "the iron pipes are the best evidence of the original corners." But Way admitted that the iron pipes he identified were not on block corners and therefore were not set at the time of

22

In sum, the Hoffmans' only justification for moving the Mena Property sideline is to better approximate the theoretical dimensions of the lots on the 1917 Plat. But the Hoffmans have not clearly demonstrated that setting the Way Iron Rod diagonally from the Original Iron Rod better approximates those theoretical dimensions than moving the Original Iron Rod towards the undisputed location of the front monument, as McMinn suggested doing at trial. Accordingly, we conclude that the evidence is not so weak as to make the trial court's judgment clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176. We overrule the Hoffmans' first issue challenging the legal and factual sufficiency of the evidence supporting the trial court's judgment that the 1993 McMinn Survey set the boundary between the Mena and Hoffman Properties.

Turning to their third issue, the Hoffmans claim legally and factually insufficient evidence supports the trial court's finding that the parties jointly own the chain link fence. Primarily, their argument rests on their claim that insufficient evidence supports the 1993 McMinn Survey boundary line on which most of the fence is located, an argument we have already rejected. However, the Hoffmans also argue that the 1993 McMinn Survey shows "that the metal fence encroaches on the Hoffman [P]roperty by 0.1 feet where the fence ends at the middle of the properties," and thus, Mena "did not purchase that section of the fence when she bought [the Mena Property]" and there was "insufficient evidence to support a finding that Mena

---

the 1917 Plat but some time after. And even if iron pipes are "one of the oldest man-made monuments," Way did not provide any evidence as to why an iron rod like the one McMinn relied on could not just as likely have been placed at a time earlier than the iron pipe was placed. Merely because iron pipes may be an older type of monument used does not make iron pipes more specific and definite—absent evidence that iron rods would not have been used at that time—such that it is the best evidence of the case.

23

owned any part of the fence that fell outside the boundaries of her property."[10]  Assuming without deciding that the Hoffmans are correct that Mena did not purchase that section of the fence when she bought the Mena Property, the undisputed evidence at trial showed that the "only part of the fence that fell outside the boundaries of [Mena's] property" consisted of half a gate post.  McMinn described the encroachment as a "front fence post (gate post) on the south side of the house, to be 0.1 foot outside the property line," and Mena testified that only one gate post encroaches on the Hoffman Property by "about an inch, which would be half the width of the gate post" but "not any of the mesh, not any of the other part of the fence" encroaches.  The undisputed evidence shows that the "only part of the fence that fell outside the boundaries of [Mena's] property" consisted of half a gate post but that the other half of the gate post did not encroach, and the Hoffmans fail to cite any authority that they would be entitled to sole ownership of half a gate post rather than joint owners of that entire gate post.  We overrule the Hoffmans' third issue that insufficient evidence supported the judgment that Mena and the Hoffmans jointly owned the fence.

In their second issue, the Hoffmans claim that the judgment is contradictory on its face, ambiguous, and "void and unenforceable because it sets out two contradictory boundary

---

[10]  Mena argued at trial that she produced evidence of being the sole owner of the fence in its entirety, and in her appellee brief she requests that "[t]o the extent this court should determine it appropriate to reverse the trial court's ruling on ownership, it should reform the judgment to comply with the only evidence presented at trial and vest ownership of the fence in [Mena]." Mena explains that McMinn testified "that based largely upon the distinctive horse head toppers and the manner in which the mesh was installed, it was his professional opinion that the fence had been installed by a prior owner of [Mena's] home."  However, McMinn testified, "I don't believe I specifically addressed ownership," and rather, "I think my statement is that it was constructed by prior property owners of her property."  Moreover, "[t]he appellate court may not grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause," Tex. R. App. P. 25.1(c), and Mena did not file a notice of appeal or show just cause here.

lines." The Hoffmans' argument is not entirely clear, but they appear to be arguing that because "one end of the metal fence actually encroached on the Hoffmans' property," a boundary line based on the fence location is contradictory or creates ambiguity as to the boundary line based on the 1993 McMinn Survey. But the trial court's judgment clearly and unambiguously declares that the 1993 McMinn Survey sets "the true and correct boundary line." Although the trial court made a finding of fact that the chain link fence "was located roughly on the common property line," this finding does not imply that the fence sets the boundary and therefore does not contradict the judgment. We overrule the Hoffmans' second issue.[11]

**Attorney's Fees**

The Hoffmans' tenth and eleventh issues challenge the attorney's fee award. The trial court awarded $15,415 in attorney's fees to Mena; made a finding of fact that Mena "presented evidence of costs and attorneys' fees of $15,415.00 incurred . . . on [the Hoffmans'] adverse possession claims"; and made a conclusion of law granting Mena "costs and attorneys' fees incurred in connection with the [Hoffmans'] Motion [for] Summary Judgment in the amount of $15,415.00." *See* Tex. Civ. Prac. & Rem. Code § 16.034(a)(2) (providing for discretionary award of costs and reasonable attorney fees when there is no groundless and bad faith finding); *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 489 (Tex. 2019) (noting distinction between "reasonable and necessary" and just "reasonable" standards "is immaterial"

---

[11] The Hoffmans also claim that Way presented undisputed evidence that the "iron rod [McMinn relied on in the northwest corner] was nine inches into the alley, which belongs to the City of Austin," and therefore that the order is unenforceable because "[b]y declaring McMinn's survey to define the true boundary line, the trial court granted the Parties part of the public alley, which belongs to the sovereign." But the judgment merely decides that "the true and correct boundary line *between Defendants' Lot 5 and the Plaintiffs' Lot 4* is as reflected on the 1993 McMinn survey." (Emphasis added.) The judgment does not determine the boundary line between the alley and the back of the properties.

25

and holding that "claimant must prove that the requested fees are both reasonable and necessary"). The Hoffmans' tenth issue is contingent upon reversal of at least one of their first nine issues. Having overruled those issues, we also overrule their tenth issue.

In their eleventh issue, the Hoffmans challenge the legal and factual sufficiency supporting the trial court's finding of fact that Mena incurred $15,415 in costs and attorney's fees. At trial, Mena's counsel testified that her rate was $300 per hour and that the total amount of fees through the order granting summary judgment was $15,415. Mena's counsel also submitted her billing records and a summary exhibit that stated "06/22/17 - 09/27/18 (date of order granting MSJ)  $15,415.00." However, as the Hoffmans point out, the admitted billing records for the relevant time total $13,599.10,[12] and there was no other evidence besides the billing records to support the higher $15,415.00 award. *See Rohrmoos Venture*, 578 S.W.3d at 496, 498 (noting that "generalities" such as "testimony about an attorney's experience, the total amount of fees, and the reasonableness of the fees" are "not sufficient to support a fee-shifting award under the lodestar method, which applies in fee-shifting situations" and holding that "fee claimant bears the burden of providing sufficient evidence on both counts" of "reasonable hours worked multiplied by a reasonable hourly rate"). Mena appears to agree, claiming that "to the extent the award was based upon a math error, which it appears to have been, it can easily be remedied by this Court through an adjustment of the award as urged by [the Hoffmans]."[13] On reviewing the record, we also agree. As requested by the parties and because the billing records

---

[12] The Hoffmans do not contest the reasonableness of the $13,599.10 amount assuming that the prevailing party status does not change on appeal.

[13] In her appellee brief, Mena initially states that opposing counsel "stipulat[ed] that such amounts were reasonable and necessary and so any complaint about the [$15,415] amount is now waived." However, Mena does not cite to the record, and our review did not reveal such stipulation.

admitted as trial evidence provide legally and factually sufficient evidence to support an award of $13,599.10, we modify the judgment to award that amount instead of the $15,415.00 award. *See* Tex. R. App. P. 43.2(b).

## CONCLUSION

Having overruled the Hoffmans' first ten issues and modified the attorney's fee award pursuant to the eleventh issue, we affirm the judgment as modified.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Kelly

Modified and, as Modified, Affirmed

Filed:   June 17, 2021

27