**Opinion issued April 14, 2026**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00542-CV

———————————

**HOUSTON INTERNATIONAL MANAGEMENT & TRADE, INC.,**
**Appellant**

**V.**

**PEACOCK SHIPPING AND TRADING, INC., CELESTIAL HOLDINGS,**
**LTD., AND CELESTIAL COMPANY, Appellees**

---

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-70719**

---

## MEMORANDUM OPINION

This trespass to try title case involves companies owned by family members

and an assertion of adverse possession. Peacock Shipping and Trading, Inc.,

Celestial Holdings, Ltd., and Celestial Company (the Peacock parties) are record title holders to 23 lots of commercial property in Houston. Marios Giakoumakos[1] owns these companies. His nephew, Spiro Giakoumakos, owns Houston International Management & Trade, Inc. (HIM), a company that leases space on the properties to third parties and to a company owned by both Spiro and Marios.

After operating on the properties for years, HIM filed suit seeking a declaration that it owns the properties, and it asserted a trespass to try title claim based on adverse possession. A jury did not find that HIM had held the properties in peaceable and adverse possession for at least ten years. The jury further found that HIM and the Peacock parties had agreed that HIM would manage the properties for the Peacock parties. The trial court rendered judgment on the jury verdict, and its final judgment included declarations that the Peacock parties owned the properties at issue.

In four issues, HIM argues that the trial court erred by (1) denying its motion for judgment notwithstanding the verdict on the issue of adverse possession; (2) submitting two jury questions relating to a management agreement between HIM and the Peacock parties and denying HIM's motion for JNOV relating to the jury's

---

[1] Marios Giakoumakos is referred to as "Marios," "Mario," and "Marcos" interchangeably throughout the appellate record. We refer to him as "Marios," the name that his counsel uses in the Peacock parties' appellate brief and the trial court used in the final judgment.

findings on the management agreement; (3) denying its motion for new trial based on juror misconduct and newly discovered evidence; and (4) declaring that the Peacock parties owned the properties.

We affirm.

## Background

Marios and John Giakoumakos were twin brothers who moved to the Houston area from Greece. In 1974, they formed a company called Twins Marine Repairs & Supplies, Inc., which provided repair and supply services to ships arriving at the Port of Houston. Marios is a mechanical engineer, and in the early days of the company, he handled the actual repair, construction, and inspection work done on ships. John focused on the administrative responsibilities of operating the business.

At some point, Twins Marine acquired 21 lots on Mayfair Street in southeast Houston, and it operated from these properties. In September 1988, Twins Marine executed three separate warranty deeds. In the first deed, Twins Marine conveyed 12 lots to Peacock Shipping and Trading, Inc. In the second deed, Twins Marine conveyed 8 lots to Celestial Holdings Limited. And in the third deed, Twins Marine conveyed an additional lot to Celestial Holdings. In an unrelated transaction that occurred nine months earlier in December 1987, Ellen and Billy Ipes conveyed two

lots on Mayfair to Celestial Company. These 23 lots are the properties at issue in this appeal. Marios owns Peacock and Celestial Holdings.[2]

On the same date that Twins Marine conveyed the properties to Peacock and Celestial Holdings, Twins Marine signed agreements leasing the properties from Peacock and Celestial Holdings for one year. The leases contained provisions allowing Twins Marine to holdover after the lease term, with Twins Marine "to be occupying the premises on the basis of a month-to-month tenancy." Twins Marine continued operating at the properties beyond the one-year lease term. In the mid-1990s, John's son Spiro Giakoumakos began working at Twins Marine while he was in college, primarily doing office work and deliveries.

In 1999, Stylianos Kallergis, a "trusted figure" to the Giakoumakos family, formed HIM at John's urging. By this time, Twins Marine had dramatically reduced its physical footprint on the properties, and it occupied only a small portion of the lots. HIM took the lead in renting out the remaining space on the properties to third parties. In 2008, Kallergis left HIM, and Spiro assumed ownership of that company.

Twins Marine also underwent changes in ownership. Although Marios had helped form the company, he had not held an ownership interest in it since the 1970s.

---

[2] Celestial Company does not appear to have an actual corporate existence. The Peacock parties acknowledged as much in their written pleadings, calling Celestial Company "an entity that does not exist." Likewise, in his petition in intervention, Marios referred to Celestial Company as "an unknown entity."

Instead, John and the twins' mother owned equal interests in the company. In 2010, Marios obtained his mother's interest, and he and John owned Twins Marine in equal shares until 2016, when Spiro received John's interest. John died in 2018.

HIM sued the Peacock parties in October 2018. It alleged that the Peacock parties did not take any actions concerning the properties, forfeited their corporate charters, and ceased doing business in Texas. HIM, on the other hand, effectively owned and operated the properties since its inception in 1999, leasing space to Twins Marine and third parties, collecting rent, and maintaining the properties. HIM requested that the trial court enter a declaration that HIM owned the properties and render judgment establishing HIM as the properties' owner under Property Code Chapter 22. HIM later amended its petition to assert a trespass to try title claim against the Peacock parties based on adverse possession.

On February 20, 2020, the Peacock parties filed a counterclaim. They alleged that Peacock and Celestial Holdings agreed to have HIM manage the properties, "including collecting rents and paying taxes." The Peacock parties allegedly terminated this management agreement in December 2019—after HIM had filed suit—and demanded that HIM turn over various documents and direct all future payments from tenants to the Peacock parties, but HIM refused. The Peacock parties asserted claims against HIM for money had and received, conversion, and breach of contract, and it sought imposition of a constructive trust, an accounting, injunctive

5

relief, and exemplary damages. Marios later intervened in the suit and asserted identical claims against HIM.

At trial, two fact witnesses testified: Spiro and Marios. Spiro testified concerning HIM's actions on the properties, including its extensive dealings as landlord to third parties that rented space on the properties. Marios worked for HIM for several years, and his duties included helping collect rent from tenants and deposit these amounts. According to Spiro, Marios never questioned why he was depositing rental payments in HIM's bank account, as opposed to an account maintained by one of the Peacock parties. Twins Marine also assisted with management, maintenance, and repairs on the properties, and it received a monthly management fee from HIM. Although yearly property tax statements for the properties were addressed to the Peacock parties, either Twins Marine or HIM paid the property taxes. Spiro testified that, when he questioned Marios about why the statements were in the name of the Peacock parties, Marios was unresponsive.

The facts were largely undisputed, although Spiro and Marios disagreed on one key point. When asked why HIM collected rent from tenants on the properties, Marios testified that HIM managed the properties for the Peacock parties. He acknowledged that no written management agreement existed between HIM and any of the Peacock parties. Instead, the parties had a verbal agreement. Marios testified that HIM was supposed to make repairs on the properties and collect rental

6

payments. After paying expenses and property taxes, HIM was then supposed to pay the remaining money first to Twins Marine and then to John, who had moved back to Greece and had ongoing financial difficulties. Spiro, on the other hand, disagreed that a management agreement existed between HIM and the Peacock parties, and he instead asserted that HIM owned the properties.

The charge asked the jury fourteen questions, six of which are relevant to this appeal.[3] Question One asked whether HIM held the properties in peaceable and adverse possession for a period of at least ten years before February 20, 2020, the date the Peacock parties filed their original counterclaim. The court defined "peaceable possession," "adverse possession," and "claim of right," and it instructed the jury on when a claim of right is hostile. The jury answered "no" to this question.

Questions Two and Three were related. Question Two asked whether HIM and the Peacock parties agreed that HIM would manage the properties for the Peacock parties, and the jury answered "yes." In response to Question Three, the jury found that HIM and the Peacock parties entered into a management agreement in "1999—HIM's formation date."

---

[3] Six questions related to the Peacock parties' affirmative claims, but the jury did not answer any of those questions in favor of the Peacock parties. The Peacock parties do not challenge these adverse findings on appeal. Two other questions in the charge asked about HIM's and the Peacock parties' attorney's fees.

7

Questions Twelve, Thirteen, and Fourteen all asked whether Peacock, Celestial Holdings, and Celestial Company were the owners of the respective properties deeded to them by Twins Marine (Peacock and Celestial Holdings) and Ipes (Celestial Company). The jury answered "yes" for all three questions.

HIM moved for judgment notwithstanding the verdict, arguing that no evidence supported the jury's finding on Question One, no evidence supported the submission of Question Two or the jury's finding on that question, and the answers to Questions Twelve, Thirteen, and Fourteen were immaterial. Alternatively, HIM argued that any evidence relating to these questions was factually insufficient to support the jury's answers.

In its final judgment, the trial court rendered judgment in favor of the Peacock parties.[4] The court denied HIM's request for a declaration that it owned the properties and instead declared that HIM did not own the properties and did not hold the properties in peaceable and adverse possession for at least ten years before the Peacock parties asserted claims to the properties. The court further declared and ordered that Peacock was the owner of 12 specified lots, Celestial Holdings was the owner of 9 specified lots, and Celestial Company was the owner of 2 specified lots.

---

[4] Although the trial court initially awarded the Peacock parties $42,500 in attorney's fees, as found by the jury, the court later granted HIM's motion to reform the judgment and removed the award of attorney's fees to the Peacock parties. The Peacock parties do not challenge this ruling on appeal.

HIM then moved for a new trial and asserted two grounds that it had not raised in its JNOV motion: juror misconduct and newly discovered evidence. As support for its juror misconduct argument, HIM attached the affidavit of a juror who described the deliberation process, conditions in the jury room, and concerns that the jurors felt rushed to deliberate late into the night and quickly reach a verdict because one juror had to leave town the next morning for several weeks and no alternate was available. In support of its newly-discovered-evidence argument, HIM attached an unsworn declaration from Stylianos Kallergis (HIM's founder) that contradicted Marios' testimony that a management agreement existed between HIM and the Peacock parties. The trial court did not hold a hearing on HIM's motion for new trial.

The trial court denied the new trial motion. This appeal followed.

## Denial of Motion for Judgment Notwithstanding the Verdict

HIM challenges the trial court's denial of its JNOV motion in its first two issues. HIM first argues that insufficient evidence supported the jury's "no" finding to Question One relating to adverse possession. Next, HIM argues that the court erred in submitting Questions Two and Three and in denying HIM's JNOV motion because insufficient evidence supported the jury's findings that a management agreement existed between HIM and the Peacock parties since HIM's formation.

9

## A. Standard of Review

The trial court may render judgment notwithstanding the verdict if a directed verdict would have been proper, and the court may disregard any jury finding on a question that does not have evidentiary support. TEX. R. CIV. P. 301. We review the denial of a motion for JNOV under a legal sufficiency or "no evidence" standard of review. *Austin Bridge & Rd., LP v. Suarez*, 556 S.W.3d 363, 376 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *see City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005).

A party that has the burden of proof at trial is entitled to judgment notwithstanding the verdict on an issue only if the evidence establishes that issue as a matter of law. *Henry v. Masson*, 333 S.W.3d 825, 849 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *see Cuadra v. Declaration Title Co.*, 682 S.W.3d 628, 633 (Tex. App.—Houston [1st Dist.] 2023, no pet.) ("The trial court should grant a JNOV when the evidence is conclusive and one party is entitled to recover as a matter of law or when a legal principle precludes recovery.") (quotation omitted). Under a no-evidence standard of review, we credit evidence supporting the jury verdict if reasonable jurors could, and we disregard contrary evidence unless reasonable jurors could not. *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009) (quotation omitted). We will uphold the jury's verdict if more than a scintilla of competent evidence supports it. *Id.*; *see Merrell Dow Pharms., Inc.*

*v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) ("More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions.") (quotation omitted).

**B.      Adverse Possession**

A party seeking to establish title to land by adverse possession bears the burden to prove every fact essential to that claim by a preponderance of the evidence. *Masonic Bldg. Ass'n of Houston, Inc. v. McWhorter*, 177 S.W.3d 465, 471 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Question One of the jury charge asked about adverse possession with the following language:

> Did [HIM] hold the Property [defined to include the 23 lots at issue] in peaceable and adverse possession for a period of at least ten years before February 20, 2020?
>
> "Peaceable possession" means possession of real property that is continuous and is not interrupted by an adverse suit to recover the property.
>
> "Adverse possession" means an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and hostile to the claim of another person.
>
> "Claim of right" means an intention to claim the real property as one's own to the exclusion of all others.
>
> A claim of right is hostile only if either (1) it provides notice, either actual or by implication, of a hostile claim of right to the true owner; or (2) the acts performed on the real property, and the use made of the real property, were of such a nature and character that would reasonably notify the true owner of the real property that a hostile claim is being asserted to the property.

To establish peaceable and adverse possession, a claimant must also have cultivated, used, or enjoyed the property.

The jury answered "no" to this question. HIM disagrees with that answer and contends that adverse possession was proved as a matter of law.

The wording of Question One guides the analysis here because HIM did not object to that wording. *See Allen v. Am. Nat'l Ins. Co.*, 380 S.W.2d 604, 609 (Tex. 1964); *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (op. on reh'g) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge."). With this principle in mind, we turn to the key words and phrases found in Question One, many of which have been explored by the courts.

Adverse possession is "an actual and visible appropriation of real property, commenced and continued under a claim of right that is inconsistent with and is hostile to the claim of another person." TEX. CIV. PRAC. & REM. CODE § 16.021(1); *McWhorter*, 177 S.W.3d at 472. "Peaceable possession" is "possession of real property that is continuous and is not interrupted by an adverse suit to recover the property." TEX. CIV. PRAC. & REM. CODE § 16.021(3).

Establishing title to property by adverse possession "requires proof of actual possession of the disputed real property that is open and notorious, peaceable, under a claim of right, adverse or hostile to the claim of the owner, and consistent and continuous for the duration of the statutory period." *Estrada v. Cheshire*, 470 S.W.3d

12

109, 123 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *Dyer v. Cotton*, 333 S.W.3d 703, 710 (Tex. App.—Houston [1st Dist.] 2010, no pet.). In this case, the relevant statutory period is ten years. *See* TEX. CIV. PRAC. & REM. CODE § 16.026(a) ("A person must bring suit not later than 10 years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who cultivates, uses, or enjoys the property."). Ordinarily, whether a party established adverse possession is a fact question. *Estrada*, 470 S.W.3d at 123.

This case turns on whether HIM's possession of the properties was hostile to the Peacock parties' claim. Possession is hostile when the acts performed by the claimant on the land and the use made of the land is "of such a nature and character as to reasonably notify the true owner of the land that a hostile claim was being asserted to the property." *Id.* (quoting *McWhorter*, 177 S.W.3d at 472). The claimant must show that it "acted in a way that visibly appropriated the disputed property in a manner that gave notice to any other person that [it] claimed a right in the property." *Id.*

Although "hostile" use does not require an intention to dispossess the rightful owner, the claimant must intend "to claim the property as one's own to the exclusion of all others." *Id.* (quoting *Tran v. Macha*, 213 S.W.3d 913, 915 (Tex. 2006) (per curiam)). Merely occupying the land without an intent to appropriate it does not support the statute of limitations. *Tran*, 213 S.W.3d at 915 (quotation omitted). Joint

13

use of property is also not enough to establish adverse possession because the "possession must be of such character as to indicate *unmistakably* an assertion of a claim of exclusive ownership in the occupant." *Id.* at 914 (quoting *Rhodes v. Cahill*, 802 S.W.2d 643, 645 (Tex. 1990) (op. on reh'g)). Because the doctrine of adverse possession "is a harsh one" that permits "taking real estate from a record owner without express consent or compensation," the law "reasonably requires that the parties' intentions be very clear." *Id.* at 915.

Many of the relevant facts in this case are undisputed. The Peacock parties did not contradict HIM's evidence that it had, over the course of decades, operated on the properties by leasing space on the properties to third parties, collecting rent, and arranging for needed repairs and maintenance on the properties. They also did not contradict HIM's evidence that it had a management agreement with Twins Marine, it paid regular management or maintenance fees to Twins Marine, and either it or Twins Marine paid the property taxes for the properties. The Peacock parties did, however, challenge HIM's assertion that it took these actions as an owner of the properties. They contended, rather, that HIM acted as it did because it and the Peacock parties agreed that HIM would manage the properties, and all the actions it took on and relating to the properties were done in a management capacity.

The Peacock parties presented evidence supporting its theory, specifically, testimony from Marios concerning a management agreement between HIM and the

Peacock parties. The Peacock parties' counsel asked Marios whether HIM owned the properties, and Marios answered that HIM never had ownership. Counsel asked what HIM did for the properties and why it collected rent. Marios responded, "Because they're managing—the managing of the buildings." Because Marios had earlier testified that there was "no agreement," counsel asked whether Marios meant a "written agreement or no agreement at all." Marios clarified: "No written agreement. Verbal agreement, they had [a] verbal agreement."

Marios testified that the owner of the properties "always" was "Peacock and Celestial," and HIM managed the properties. HIM's responsibilities included collecting money from tenants, completing repairs, and "all [it was] supposed to do as managers." HIM was supposed to pay the money that it collected from tenants to the Peacock parties, but instead Marios made a different arrangement with his brother John, who had ongoing financial difficulties. Under their arrangement, after payment of expenses (including property taxes), HIM was supposed to pay any remaining amounts to Twins Marine, which would then send the money to John in Greece.

This testimony is some evidence that a management agreement existed between HIM and the Peacock parties, under which HIM would take actions on the properties that included collecting rent from tenants and paying necessary expenses, such as property taxes. There is therefore some evidence in the record that HIM's

possession of the properties was not hostile because HIM's acts were not "of such a nature and character as to reasonably notify the true owner of the land that a hostile claim was being asserted to the property." *See Estrada*, 470 S.W.3d at 123.

The jury was faced with conflicting evidence. Spiro testified that HIM owned the properties and took actions consistent with ownership. Marios testified that Peacock and Celestial Holdings always owned the properties, a verbal management agreement existed between HIM and the Peacock parties, and all HIM's actions on the properties—including collecting rent from tenants, making repairs, and paying property taxes—were part of HIM's responsibilities under the management agreement. Under this evidentiary record, the jury was free to find HIM's possession of the properties was not "of such character as to indicate *unmistakably* an assertion of a claim of exclusive ownership in the occupant." *See Tran*, 213 S.W.3d at 914 (quotation omitted).

Because the record contains some evidence that HIM's possession of the properties was not hostile to the claims of the Peacock parties, we conclude that the trial court did not err by denying HIM's motion for JNOV. *See Tanner*, 289 S.W.3d at 830 (stating that jury's finding will be upheld if more than scintilla of competent evidence supports it); *Cuadra*, 682 S.W.3d at 633 ("The trial court should grant a JNOV when the evidence is conclusive and one party is entitled to recover as a matter of law or when a legal principle precludes recovery.") (quotation omitted).

16

A similar ruling is in order with respect to HIM's great weight and preponderance challenge to the jury's No answer to Question One. Strictly speaking, the pertinent statement of the issue by HIM does not mention great weight and preponderance: HIM's first issue raises only a legal challenge, not a factual challenge. However, in the argument section of the brief, HIM contends that the great weight and preponderance of the evidence established a Yes answer to Question One, so we will construe the brief as having formally presented such a complaint about the No answer. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 633 (Tex. 1986) (op. on reh'g) ("It is our practice to liberally construe the points of error in order to obtain a just, fair and equitable adjudication of the rights of the litigants. We look not only at the wording of the points of error, but to the argument under each point to determine as best we can the intent of the party.") (quotation and internal citation omitted).

When so construed, the great weight complaint fails on the merits. According to HIM, the testimony adduced by the Peacock parties simply was not "credible evidence." HIM emphasizes this point about credibility. For example, HIM acknowledges that Marios testified in a way that would allow the jury to answer No to Question One, but HIM counters that there is literally nothing to corroborate that testimony "other than it was spoken out loud at trial" and that the "statement is not credible evidence." HIM presses this argument with genuine conviction, and we

17

fully understand the position. But at bottom, HIM's argument asks us to climb over the rail and get into the jury box as a thirteenth juror. This we cannot do.

The very first paragraph of the instructions given to the jury promise the jurors that credibility determinations belong to them and them alone: "You are the sole judges of the credibility of the witnesses and the weight to be given to their testimony." That promise would be broken if we accepted HIM's argument. *See In re Rudolph Auto., LLC*, 674 S.W.3d 289, 306 (Tex. 2023) (orig. proceeding) ("[T]he jurors alone must assess the credibility of the witnesses and the weight to afford their testimony."); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) ("It is a familiar principle that in conducting a factual sufficiency review, a court must not merely substitute its judgment for that of the jury."). We conclude the jury's No answer to Question One is not against the great weight and preponderance of the evidence. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam) ("When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence.").

We overrule HIM's first issue.

## C. Existence of a Management Agreement

HIM next argues that the trial court should not have submitted Questions Two and Three and should have granted HIM's motion for JNOV relating to these

18

questions because no evidence supported the existence of a management agreement between HIM and the Peacock parties.

Question Two asked whether HIM and the Peacock parties, as owners of the properties, agreed that HIM would manage the properties for the Peacock parties. Question Three, which was predicated on a "yes" answer to Question Two, asked when HIM and the Peacock parties "enter[ed] into such agreement." The jury answered "yes" to Question Two and "1999—HIM's formation date" to Question Three.

The trial court "shall submit the questions, instructions and definitions" that "are raised by the written pleadings and the evidence." TEX. R. CIV. P. 278; *Brumley v. McDuff*, 616 S.W.3d 826, 831 (Tex. 2021). Rule 278 "provides a substantive, non-discretionary directive to trial courts requiring them to submit requested questions to the jury if the pleadings and any evidence support them." *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992). A trial court may refuse to submit an issue only if the record contains no evidence to warrant its submission. *Id.*; *Zoanni v. Hogan*, 715 S.W.3d 47, 81 (Tex. App.—Houston [1st Dist.] 2024, pet. denied) (op. on reh'g). If the record contains some evidence to support a jury question, the trial court commits reversible error if it does not submit the question. *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 318 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (op. on reh'g). In determining whether record evidence supports submission of a

19

question, we examine the record for evidence supporting the question and ignore all evidence to the contrary. *Elbaor*, 845 S.W.2d at 243; *Pitts & Collard*, 369 S.W.3d at 318. "Conflicting evidence presents a fact question for the jury." *Pitts & Collard*, 369 S.W.3d at 318.

As we have already discussed, the record includes some evidence that HIM and the Peacock parties had a verbal agreement for HIM to manage the properties for the Peacock parties. The trial court was therefore required to submit Questions Two and Three to the jury. *See Elbaor*, 845 S.W.2d at 243; *Pitts & Collard*, 369 S.W.3d at 318. The conflicting evidence on this point presented a fact question for the jury, and because some evidence existed that HIM and the Peacock parties made a verbal management agreement, the trial court properly denied HIM's motion for JNOV on this basis. *See Tanner*, 289 S.W.3d at 830 (stating that jury's finding will be upheld if more than scintilla of competent evidence supports it).

As it did in its first issue, HIM also argues that the jury's answers to Questions Two and Three are against the great weight and preponderance of the evidence. HIM again argues that "[t]here is simply no credible evidence of a management agreement between HIM" and the Peacock parties, and "there is nothing to support the statement other than it was spoken out loud by" Marios. For the reasons stated above, we cannot reweigh the jury's credibility determinations. *See In re Rudolph Auto.*, 674 S.W.3d at 306; *Golden Eagle Archery*, 116 S.W.3d at 761. We conclude that the

20

jury's answers to Questions Two and Three were not against the great weight and preponderance of the evidence.

We overrule HIM's second issue.

**Denial of Motion for New Trial**

In its third issue, HIM argues that the trial court erred by denying its motion for new trial. This complaint has two strands: one alleges jury misconduct and the other alleges newly discovered evidence. Neither strand has any merit.

**A.     Standard of Review**

We review a trial court's denial of a motion for new trial for an abuse of discretion. *B. Gregg Price, P.C. v. Series 1 – Virage Master LP*, 661 S.W.3d 419, 423 (Tex. 2023) (per curiam); *Powell v. Comm'n for Law. Discipline*, 710 S.W.3d 288, 333 (Tex. App.—Houston [1st Dist.] 2024, no pet.) (per curiam) ("We review a trial court's denial of a motion for new trial based on newly[] discovered evidence under an abuse of discretion standard[,] and we indulge every reasonable presumption in favor of the trial court's refusal to grant a new trial.") (quotation omitted).

**B.     Juror Misconduct**

In arguing that it deserved a new trial based on jury misconduct, HIM relied on an affidavit from a juror. The affidavit incorporated by reference an email that the juror sent to the trial court (and HIM's counsel) a few days after the trial

21

concluded. The juror recounted problems that allegedly occurred during deliberations, including beginning deliberations after 5:00 p.m., the need to conclude deliberations that evening because a juror was leaving town the next morning and would not return for nearly two months, no meals, a very hot deliberation room, transportation concerns, concerns about medications, and calls and texts from spouses angry that deliberations were lasting so long on Valentine's Day. The juror stated that she did not "believe the verdict was based on the evidence but rather because we felt forced to make a decision that evening."

Rule of Civil Procedure 327 sets out a procedure for raising issues of jury misconduct:

a. When the ground of a motion for new trial, supported by affidavit, is misconduct of the jury or of the officer in charge of them, or because of any communication made to the jury, or that a juror gave an erroneous or incorrect answer on voir dire examination, the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or the communication made, or the erroneous or incorrect answer on voir dire examination, be material, and if it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.

b. A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict concerning his mental processes in connection therewith, except that a juror may testify whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit

22

or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

TEX. R. CIV. P. 327. Rule of Evidence 606(b) contains a similar prohibition, providing that a juror "may not testify about any statement made or incident that occurred during the jury's deliberations," "the effect of anything on that juror's or another juror's vote," or "any juror's mental processes concerning the verdict," but the juror may testify "about whether an outside influence was improperly brought to bear on any juror." TEX. R. EVID. 606(b).

HIM's complaint of jury misconduct fails for want of evidence. The record contains a juror affidavit attached to the motion for new trial, but it does not contain any testimony to support the factual assertions of misconduct.

Under settled tenets of Texas procedure, an affidavit attached to a new trial motion furnishes a starting point for proving jury misconduct but not an endpoint. *See In re Zimmer, Inc.*, 451 S.W.3d 893, 901 (Tex. App.—Dallas 2014, orig. proceeding) (stating that to obtain hearing on alleged juror misconduct, party raising claim must provide assurance to trial court that it will probably be able to support allegations in motion by providing affidavits that tend to establish misconduct). The affidavit simply provokes the right to a hearing so that the movant can have a chance to prove up the allegations with evidence. In other words, after the filing of such a motion and affidavit, the next step is for the court to "hear evidence" about the matter

"in open court." TEX. R. CIV. P. 327(a); *In re Zimmer*, 451 S.W.3d at 901 ("A proceeding under rule 327 is not complete, however, upon the filing of the affidavits.").

HIM does not point us to any such evidence. Instead, HIM cites only the affidavit from the juror, which will not do. "Affidavits alleging jury misconduct do not constitute evidence of the facts therein stated." *Innes v. Greiner*, 449 S.W.2d 83, 85 (Tex. Civ. App.—Amarillo 1969, no writ); *see McNutt v. Qualls*, 433 S.W.2d 521, 524 (Tex. Civ. App.—Dallas 1968, no writ) ("The [juror] misconduct is not provable by affidavit alone."). As the Dallas Court of Appeals has pointed out, a trial court ruling on a motion for new trial based solely on affidavits alleging juror misconduct "cannot perform the critical function of assessing the credibility of the affiants, who are making serious charges about the manner in which their fellow jurors have discharged their duties." *In re Zimmer*, 451 S.W.3d at 901. This refusal to consider the affidavit as evidence has been the law in this district for decades. *See City of Houston v. Fondren*, 198 S.W.2d 480, 483 (Tex. Civ. App.—Galveston 1946, writ ref'd n.r.e.) ("The affidavits [alleging juror misconduct] were neither evidence nor admissible as such on the hearing for a new trial."); *see also In re Zimmer*, 451 S.W.3d at 901 ("[A]ffidavits attached to a motion for new trial alleging juror misconduct are neither evidence nor admissible as such on the hearing for a new trial on the ground of jury misconduct.") (quotation omitted).

Thus, "when, as here, a party files a motion for new trial supported by affidavits but presents no live evidence at the hearing, that party fails to prove the alleged misconduct, and the trial court cannot grant a new trial based on that conduct." *In re R.E.S.*, 725 S.W.3d 471, 492 (Tex. App.—El Paso 2025, orig. proceeding); *see In re Zimmer*, 451 S.W.3d at 902 ("[A] trial court may properly deny a motion for new trial when a party alleging jury misconduct relies only on affidavits and fails to request a hearing on his motion and offer live testimony proving misconduct."); *Allison v. Gulf Liquid Fertilizer Co.*, 381 S.W.2d 684, 686 (Tex. Civ. App.—Fort Worth 1964, no writ) ("The witnesses must be timely presented in court."). We overrule HIM's complaint of jury misconduct.

## C. Newly Discovered Evidence

As for newly discovered evidence, this complaint fares no better. After the final judgment, HIM submitted an unsworn declaration of a third party for the purpose of controverting the testimony of Marios. Specifically, Stylianos Kallergis wrote the following:

> It was not until recently that I learned of the testimony of Mario Giakoumakos, ("Mario"), at the trial of this case, as it relates to any agreements regarding the properties at issue in this case. His testimony, e.g., that a management agreement existed between H.I.M., and the Defendants in this case regarding the properties at issue is not true and misleading. I was the first owner of Houston International Management & Trade, Inc., ("H.I.M."), from the years 1999 to 2008, which company I owned and operated as a 100% owner. As the owner of H.I.M., during 1999 to 2008, I never made or entered into any verbal or written agreements between myself and/or H.I.M., and Peacock Shipping and

25

Trade, Inc., nor Celestial Holdings, LTD, nor Celestial Company, nor Mario Giakoumakos, and particularly none regarding the management of the properties at issue.

I live in Greece and was unavailable for the trial of this case, but offer this Unsworn Declaration so that justice may prevail. Had I been available for the trial, I would have voluntarily contradicted Mr. Mario Giakoumakos' testimony in these regards as it was simply manufactured.

A party seeking a new trial based on newly discovered evidence must demonstrate that (1) the evidence has come to its knowledge since the trial; (2) its failure to discover the evidence sooner was not due to lack of diligence; (3) the evidence is not cumulative; and (4) the evidence is so material it would probably produce a different result if a new trial were granted. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). The evidence from Kallergis fails at least the first of these prongs because it constitutes "new evidence" rather than "newly discovered" evidence.

This Court has held that "evidence not in existence prior to judgment cannot support a new trial." *Creative Chateau, LLC v. City of Houston*, No. 01-21-00327-CV, 2023 WL 162741, at *9 (Tex. App.—Houston [1st Dist.] Jan. 12, 2023, no pet.) (mem. op.) (brackets and quotation omitted); *see also In re S.M.V.*, 287 S.W.3d 435, 452 (Tex. App.—Dallas 2009, no pet.) ("[T]he record shows the evidence of Vo's conviction was not in existence prior to the trial court's order. Therefore, that evidence does not satisfy the burden that must be met to obtain a new trial on the

ground of newly discovered evidence."); *Sifuentes v. Tex. Emps.' Ins. Ass'n*, 754 S.W.2d 784, 787 (Tex. App.—Dallas 1988, no writ) (concluding that evidence could not form basis for new trial because evidence was "new evidence rather than newly discovered evidence").

In addition, the trial court had the discretion to find the fourth prong unmet. *See Creative Chateau*, 2023 WL 162741, at *8 ("Whether a motion for new trial based on newly discovered evidence will be granted or refused generally is a matter left to the sound discretion of the trial court."). To establish this prong, a movant must show that the evidence "would probably produce a different result." *Waffle House*, 313 S.W.3d at 813. Texas has required this "different result" showing for more than 175 years. *See Watts v. Johnson*, 4 Tex. 311, 319 (1849) (requiring movant to prove that newly discovered evidence "would probably change the result upon a new trial"); *Madden v. Shapard*, 3 Tex. 49, 50 (1848) (requiring showing that evidence "would, probably, produce a different result upon a new trial, if granted").

The Texas Supreme Court explained its rationale for requiring newly discovered evidence to meet certain requirements:

> [I]f it is left even doubtful that [the movant] knew of the evidence, or that he might but for negligence have known and produced it, his application may well be refused. It can never be permitted to a party to produce just so much evidence as he may think proper, and ultimately obtain a new trial on the ground that he did not on the first trial give all the evidence which he then might and which he has since found he ought to have given. Such a practice, it has been truly said, would be of most dangerous consequence.

27

*Sweeney v. Jarvis*, 6 Tex. 36, 42 (1851).

These principles persuade us that both sides had a full day in court and that HIM has no right to a do-over. HIM called all the witnesses it wanted. First, it called Spiro to testify to his version of the facts (which he did at length), and then it called Marios as the trial's other witness (and he too testified at length). HIM deposed Marios before trial and impeached him with deposition answers on the stand.

HIM's briefing identifies various points that call Marios' testimony into question, and the jury heard those criticisms at length. HIM had ample latitude to test Marios' credibility during trial. HIM plainly knew about Kallergis, in that Spiro testified about him on numerous occasions throughout the trial.[5] The record does not persuade us that putting Stylianos Kallergis on the stand probably would have produced a different result. The trial court certainly had the discretion to conclude that HIM did not establish such a probability.

We overrule HIM's third issue.

## Ownership of the Properties

Finally, in its fourth issue, HIM contends that the trial court erred in decreeing that any of the Peacock parties owned the properties.

---

[5] We also note that the Peacock parties alleged that "Peacock and Celestial agreed to have Houston International manage" the properties in its original counterclaim filed in February 2020, approximately four years before trial.

HIM asserted a claim for trespass to try title, and the final judgment expressly rejected that claim. The trial court declared that HIM was not the owner of the properties and did not hold title to the properties based on adverse possession. The court further declared that the Peacock parties are the owners of the properties.

On appeal, HIM challenges this aspect of the judgment. Its complaint takes aim at the jury's "yes" answers to Questions 12–14. Question 12 asked whether Peacock is the owner of the Peacock properties, specifically defined in the charge as the 12 lots deeded to Peacock by Twins Marine. Question 13 posed a similar inquiry about Celestial Holdings, and Question 14 did so about Celestial Company. Based on its premise that the jury answered these questions incorrectly, or perhaps on its alternate premise that the questions were immaterial, HIM concludes that the trial court should not have declared the Peacock parties the property owners.

Regardless of what one may say about Questions 12–14, the inescapable reality remains that HIM sought relief in trespass to try title and lost. That fact alone drives the outcome. A plaintiff's right to recover on a trespass to try title claim depends on the strength of its own title, not on the weaknesses of the title of its adversary. *Ramsey v. Grizzle*, 313 S.W.3d 498, 505 (Tex. App.—Texarkana 2010, no pet.) (citing *Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 768 (Tex. 1994)). Thus, if the plaintiff fails to satisfy its "burden of proof of superior title, the defendant is entitled to judgment without proving any right of title of possession."

*Wells v. Kan. Univ. Endowment Ass'n*, 825 S.W.2d 483, 486 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *see Hejl v. Wirth*, 343 S.W.2d 226, 226 (Tex. 1961) ("If the plaintiff under the circumstances fails to establish his title, the effect of a judgment of take nothing against him is to vest title in the defendant.").

In this case, HIM did not meet its burden to establish that it had obtained title to the properties through adverse possession. The trial court properly entered a take-nothing judgment against it, and the portions of the final judgment declaring the Peacock parties to be owners of their respective lots were not erroneous. *See Lile v. Smith*, 291 S.W.3d 75, 79 (Tex. App.—Texarkana 2009, no pet.) ("The effect of a take-nothing judgment in a suit for trespass to try title is to vest whatever claim or title to the lands which the plaintiff possesses in the defendant. This harsh rule has remained the law in Texas for well over a century.").

We overrule HIM's fourth issue.

## Conclusion

We affirm the judgment of the trial court.


David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Johnson.

30